## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SERIES 21-12-1644, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 17-04-631, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 23-05-1945, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; and SERIES 16-08-483, a designated series of MSP RECOVERY CLAIMS, SERIES LLC,<br><br>     Plaintiffs,<br><br> v.<br><br>REGENERON PHARMACEUTICALS, INC.; AMERISOURCEBERGEN DRUG CORPORATION D/B/A CENCORA, INC.; PATIENT ACCESS NETWORK FOUNDATION; CHRONIC DISEASE FUND D/B/A GOOD DAYS; ASD SPECIALTY HEALTHCARE, LLC D/B/A BESSE MEDICAL SUPPLY; and THE LASH GROUP, LLC,<br><br>     Defendants. | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ 3

   I.    PARTIES ........................................................................................................ 7

   II.   JURISDICTION AND VENUE ..................................................................... 13

   III.  STANDING ................................................................................................... 14

      Assignment Agreements & Exemplars ........................................................... 16

   IV.  BACKGROUND ........................................................................................... 26

      Regulatory Background .................................................................................. 26

      Abusing Copay Assistance to Induce Patient and Physician Decisions and Boost Profits ... 37

   V.    FACTUAL ALLEGATIONS ........................................................................ 40

      Defendants' Scheme Implicated Relations of Special Trust ................................. 78

      The Harmful Impact on Assignors and Class Members ........................................ 83

   VI.   CLASS ACTION ALLEGATIONS ............................................................ 85

   VII.  TOLLING OF THE STATUTE OF LIMITATIONS.................................... 88

   VIII. CLAIMS FOR RELIEF ................................................................................ 90

DEMAND FOR JUDGEMENT ............................................................................. 137

JURY DEMAND .................................................................................................... 138

Plaintiffs, SERIES 21-12-1644, a designated series MSP RECOVERY CLAIMS, SERIES LLC ("Series 21-12-1644"); SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 17-03-615"); SERIES 17-04-631, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 17-04-631"); SERIES 23-05-1945, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 23-05-1945"); and SERIES 16-08-483, a designated series of MSP RECOVERY CLAIMS, SERIES LLC ("Series 16-08-483") (collectively, "Plaintiffs") on behalf of themselves and the Class described herein,[1] bring this action against Regeneron Pharmaceuticals, Inc. ("Regeneron"); AmerisourcBergen Drug Corporation d/b/a Cencora, Inc. ("Amerisource" or "ABC"); Chronic Disease Fund ("CDF"); Patient Access Network Foundation ("PANF"); ASD Specialty Healthcare, LLC d/b/a Besse Medical Supply ("Besse"); and The Lash Group, LLC ("Lash Group" or "Lash"), and allege as follows:

## NATURE OF ACTION

1.      Defendants conspired to systematically increase the utilization of specialty eye medication, Eylea, that costs health approximately $2,000 per dose. Had Defendants' scheme not been in place, Plaintiffs' Assignors[2] would have paid for a drug that would have only cost $55 per dose.

2.      When a pharmaceutical is purchased through insurance, including under the

---

[1] The Class Members consist of Medicare Advantage health plans—i.e., Medicare Advantage entities such as Medicare Advantage Organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), and other Medicare first tier and downstream entities—and their assignees (collectively referred to as "MA Plans" or "Medicare Advantage health plans").

[2] Plaintiffs holds assigned rights through assignments from several entities including MAOs, full-risk organizations such as MSOs, IPAs, and other Medicare and Medicaid first-tier, downstream, and related entities (herein referred to as "Assignors"), all of which act as insurers and direct payors and provide prescription drug benefits to their enrolled beneficiaries.

Medicare framework, the cost of the pharmaceutical is split in two portions, beneficiary cost share (often called copayment or cost-sharing amount), which in the Medicare Part B framework is generally 20% the cost of the drug, and the remaining 80% is paid by the beneficiaries' health plan.

3.      Congress has stated that, when beneficiaries have to pay a portion of the costs of their medical care, they will be cost conscious, and manufacturers will be forced to price their products based on market forces.

4.      Eylea is used for individuals with wet age-related macular degeneration ("wet AMD"), as the name would lead one to believe, the onset of wet AMD occurs predominately in the Medicare aged population. Internal Regeneron documents state that 92% of individuals with wet AMD are above the age of 65, with over 50% of individuals with wet AMD over the age of 80.

5.      Eylea is a drug that is paid for under Medicare Part B and C.

6.      Plaintiffs' Assignors provide services pursuant to Medicare Part C contracts, and each Medicare Part C provider is required to provide payment for services that fall within Medicare Parts A and B.

7.      Due to the cost of Eylea, Medicare beneficiary cost sharing exceeded $300 per Eylea treatment. Regeneron knew this high cost-sharing amount would be a hinderance in Eylea use before Eylea was even on the market and took strides to circumvent this Congressionally mandated requirement.

8.      Regeneron needed help to circumvent copayment requirements, Regeneron found willing partners with ABC, including several of its subsidiaries Lash, and Xcenda Consulting ("Xcenda"), and "independent" charities, such as PANF, which was created by Lash, and CDF.

4

9. Lash Group, PANF, and Xcenda had regular meetings and ongoing business relationships with Genentech, the manufacturer of the main products that compete with Regeneron's Eylea. These meetings and business relationships with Genentech allowed Lash, Xcenda, and PANF, to seamlessly allow Regeneron to capitalize on Medicare Part C health plans.

10. CDF conditioned providing copayments for patients with wet AMD not only on Regeneron deciding to donate but also on Regeneron and Genentech both providing copayments for their "market share" of wet AMD patients.

11. Meaning, for *any* copayments to be provided by CDF for wet AMD, Regeneron and Genentech were required to donate the amount CDF requested for each manufacturer's "market share" of the fund, regardless of any donations from private individuals to the wet AMD fund. Which would seemingly run afoul of the IRS Public Support Test.[3]

12. Regeneron's partners were handsomely rewarded for their roles, internal documents show that during the scheme's pendency each conspirator received record revenues.

13. As a result of the copayment scheme, Plaintiffs Assignors were damaged due to overutilization of Eylea.

14. Defendants' scheme also violated state and federal bribery laws thereby disqualifying claims for Eylea from payment. As a result, Plaintiffs' Assignors and the Class Members paid over inflated prices for Eylea for tainted and unpayable claims and for artificially inflated quantities of Eylea on behalf of beneficiaries enrolled in their health plans.

15. Regeneron's bribes and/or kickbacks to CDF and PANF constituted violations of the Federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7, thereby rendering each claim

[3] Nonprofits who function as public charities must pass the public support test, the test confirms that charities have broad public support and requires that 33% of donations comes from small donors who give less than 2% of the funds revenue.

unpayable by federal healthcare programs. Regeneron's bribes and/or kickbacks also violated several state laws, namely, (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Mo. Rev. Stat. § 191.905; (6) 5 R.I. Gen. Laws § 5-48.1-3; and (7) Tex. Occ. Code Ann. § 102.001. Accordingly, these bribes and/or kickbacks constituted "unlawful activity" under 18 U.S.C. § 1952(b), as bribery in violation of the laws of the United States, Connecticut, Florida, Illinois, Massachusetts, Rhode Island, and Texas.

16.    Defendants also used interstate mail and wire facilities with the intent to (1) distribute the proceeds from this unlawful activity, and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on of this unlawful activity. Assignors and Class Members were proximately harmed each time a tainted claim was submitted, under the false pretense that it was a "clean" claim and paid by the Assignors and Class Members. This caused the Assignors and Class Members to not get the "benefit of their bargain" i.e., paying a claim that was free from unlawful activity.

17.    As a result of Regeneron's over inflation of the ASP, Plaintiffs Assignors were damaged by the difference between what the ASP should have been and that reported by Regeneron.

18.    Regeneron not only employed the copayment circumvention scheme to defraud health plans about beneficiaries providing required cost sharing, but additionally misreported statutorily required and defined prices for Eylea. 42 C.F.R. § 414.804.

19.    Medicare health plans use the Average Sales Price ("ASP") to determine pricing for Medicare Part B products, 42 C.F.R. § 414.904.

20.    Regeneron accomplished this misreporting by failing to take into account price

concessions that Regeneron provided to intermediaries that would have lowered the ASP dramatically.

21.     Had the ASP been accurately stated by Regeneron, Plaintiffs' Assignors would have paid less per dose of Eylea.

I.     **PARTIES**

*Plaintiffs*

22.     Plaintiffs are companies that assist Government Healthcare Plans in identifying claims payments that are subject to recoupment, either because they were conditional secondary payments or because there was fraud, mistake, or other recovery rights implicated by the payment. Pursuant to this, Plaintiffs obtained Assignments from their Assignors to recover claims paid to Defendants as a result of Defendants' fraud, waste, and abuse. Assignors provide health insurance coverage, pursuant to Medicare Part C and Part D and Medicaid on behalf of their enrollees. [**Exhibit A,** Assigned Claims]. Specifically, Assignors made payments for, or otherwise became financially responsible for the cost of the illegally inflated, AKS-tainted, and excessively dispensed Eylea as a result of the Scheme.

23.     Each and every cause of action identified in this Complaint was expressly assigned to the named Plaintiffs. [**Exhibit** B, Assignment Agreements].

24.     Series 21-12-1644 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

25.     Series 17-03-615 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

26.     Series 21-12-1644 and Series 17-03-615 have the right to seek reimbursement for payments of Eylea made by its assignor AvMed, Inc. ("AvMed") for which Defendants are liable due to the conduct alleged herein.

27.     Series 17-04-631 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

28.     Series 17-04-631 has the right to seek reimbursement for payments of Eylea made by its assignor Fallon Community Health Plan, Inc. ("FCHP") for which Defendants are liable due to the conduct alleged herein.

29.     Series 23-05-1945 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

30.     Series 23-05-1945 has the right to seek reimbursement for payments of Eylea made by its assignor Health Alliance Medical Plans, Inc. ("HEAL") for which Defendants are liable due to the conduct alleged herein.

31.     Series 16-08-483 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

32.     Series 16-08-483 has the right to seek reimbursement for payments of Eylea made by its assignor Emblem Health Services Company, LLC, Group Health Incorporated, and Health Insurance Plan of Greater New York ("Emblem") for which Defendants are liable due to the conduct alleged herein.

33.     AvMed, FCHP, HEAL and Emblem are collectively referred to as "Assignors".

34. The Assignors made purchases of Eylea from *at least* 2011 to 2021.

35. Defendants' Co-Payment Circumvention Enterprise triggered payment obligations of Assignors and Class Members. These actions caused the Assignors and Class Members to pay artificially inflated prices for Eylea. The fraudulent and anticompetitive conduct described herein directly caused damage to Assignors and the Class Members.

<div align="center">***Defendants***</div>

*Regeneron*

36. Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron") is a corporation organized under the laws of the State of New York with its principal place of business at 777 Old Saw Mill River Road, Terrytown, NY 10591. At all relevant times, Regeneron advertised, marketed, and sold Eylea throughout all states and territories of the United States, including the District of Columbia.

37. Regeneron's wrongful conduct was authorized, ordered, and/or undertaken by Regeneron's various officers, agents, employees, or other representatives while actively engaged in the management of Regeneron's affairs. That conduct was undertaken in the course of the employment of Regeneron's officers, agents, employees, or other representatives, within the scope of their duties, and with their actual, apparent, or ostensible authority.

38. This Court has personal jurisdiction over Regeneron because the Co-Payment Scheme, to which Regeneron is a party, constitutes doing or causing any act to be done, or consequences to occur, in the District resulting tortious injury under D.C. Code § 13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Regeneron transacts its affairs in the District of Columbia, including the marketing and sale of Eylea. Regeneron maintains systematic and continuous contacts in the District of Columbia, and regularly

transacts business in the District of Columbia. Regeneron purposefully availed itself of the privilege of conducting activities in the District of Columbia.

*AmerisourceBergen*

39.    Defendant AmerisourceBergen Drug Corporation d/b/a Cencora, Inc. ("Amerisource" or "ABC") is a corporation organized under the laws of Delaware and has its principal place of business at 1300 Morris Drive, Chesterbrook, Pennsylvania 19087. Amerisource is a drug wholesale company that provides drug distribution and related services. Amerisource conducts business nationwide, including in the District of Columbia. In or around August 2023, AMC announced that it changed its name to Cencora, Inc. Accordingly, for purposes of this action, references to ABC shall be understood to refer to the entity now known as Cencora, Inc.

40.    This Court has personal jurisdiction over ABC because the Co-Payment Scheme, to which ABC is a conspiring member, constitutes doing or causing any act to be done, or consequences to occur, in the District resulting in tortious injury under D.C. Code § 13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." ABC transacts its affairs in the District of Columbia, including the marketing, sale, and distribution of Eylea. ABC maintains systematic and continuous contacts in the District of Columbia, and regularly transacts business in the District of Columbia. ABC purposefully availed itself of the privilege of conducting activities in the District of Columbia.

*Besse Medical Supply*

41.    Defendant ASD Specialty Healthcare, LLC d/b/a Besse Medical Supply ("Besse"), a subsidiary of Defendant Amerisource, has its principal place of business at 9075 Centre Pointe Drive, Suite 140, West Chester, Ohio 45069. Besse Medical is a nationwide distributor of pharmaceuticals, vaccines, and other biological products to physicians. Besse Medical conducts

business nationwide, including in the District of Columbia. At all relevant times herein, Besse was the subsidiary of ABC that worked closely with Regeneron, The Lash Group, and providers to cause the submission of fraudulently- generated, and overpriced claims of Eylea. Accordingly, references in this Complaint regarding ABC's actions in the context of distribution of Eylea shall be understood as allegations encompassing ABC and Besse, individually and collectively.

42.     This Court has jurisdiction over Besse because the Co-Payment Scheme, to which Besse is a conspiring member, constitutes doing or causing any act to be done, or consequences to occur, in the District resulting tortious injury under D.C. Code § 13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Besse transacts its affairs in the District of Columbia, including the marketing, sale, and distribution of Eylea. Besse maintains systematic and continuous contacts in the District of Columbia, and regularly transacts business in the District of Columbia. Besse purposefully availed itself of the privilege of conducting activities in the District of Columbia.

*Lash Group*

43.     Defendant The Lash Group, LLC ("Lash Group" or "Lash") is a patient support company owned by ABC that provides patient support services, business analytics and technology services, and other services to pharmaceutical companies with its principal place of business located at 1 West First Ave, Conshohocken, Pennsylvania, 19428. At all relevant times herein, Lash Group worked closely with Regeneron, Besse, and providers to cause the submission of fraudulently generated and overpriced claims of Eylea. Accordingly, references in this Complaint regarding ABC's actions in the context of patient support services and referrals of beneficiaries taking Eylea (referred to throughout as "Eylea-specific" patients or beneficiaries) shall be understood as allegations encompassing ABC and Lash Group, individually and collectively.

44.     This Court has personal jurisdiction over Lash because the Co-Payment Scheme, to which Lash is a conspiring member, constitutes doing or causing any act to be done, or consequences to occur, in the District resulting in tortious injury under D.C. Code § 13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Lash transacts its affairs in the District of Columbia, including the marketing and sale of Eylea, Lash also would regularly come to the District of Columbia to attend meetings with Patient Access Network Foundation, located in Washington, D.C. Lash maintains systematic and continuous contacts in the District of Columbia, and regularly transacts business in the District of Columbia. Lash purposefully availed itself of the privilege of conducting activities in the District of Columbia.

*PANF*

45.     Defendant Patient Access Network Foundation ("PANF") is a District of Columbia not for profit entity with its principal place of business in Washington, D.C. PANF operates funds that receive donations from pharmaceutical manufacturers and uses a portion of those payments to subsidize the co-payment obligations of patients, including Assignors' Enrollees and the Class Members. At all relevant times herein, PANF was operated, controlled and managed by Defendant Lash Group.

46.     This Court has personal jurisdiction over PANF because PANF is domiciled in, organized under the laws of, and maintains its principal place of business in the District of Columbia. D.C. Code § 13-422. PANF engaged in substantial and not isolated activity in the District of Columbia relating to the Co-Payment Scheme, resulting in Assignors and the Class Members sustaining financial injuries.

*CDF*

47.     Defendant Chronic Disease Fund, Inc., ("CDF") is a Texas not for profit entity with

a principal place of business in Frisco, Texas. CDF operates funds that receive donations from pharmaceutical manufacturers and uses a portion of those payments to subsidize drug co-payment obligations of patients, including Assignors' Enrollees and the Class Members.

48.     This Court has personal jurisdiction over CDF because the Co-Payment Scheme, to which CDF is a conspiring member, constitutes doing or causing any act to be done, or consequences to occur, in the state resulting in tortious injury under D.C. Code § 13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." CDF transacts its affairs in the District of Columbia, including the marketing, advertising, solicitation of patients and physicians, and distribution of copayments for Eylea. CDF maintains systematic and continuous contacts in the District of Columbia, and regularly transacts business in the District of Columbia. CDF purposefully availed itself of the privilege of conducting activities in the District of Columbia.

## II.    JURISDICTION AND VENUE

49.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The causes of action alleged arise under federal law.

50.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Plaintiffs are completely diverse from Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

51.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from Defendants, there are at least 100 class members, and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

52.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state-law claims are so related to the federal claims as to form part of the same case or controversy.

53.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in the District of Columbia. Venue is also proper under 28 U.S.C. § 1392(b)(3) because, considering not all Defendants are residents of this judicial district, at least one defendant is subject to the court's personal jurisdiction with respect to this action. Venue is also proper in this district under 18 U.S.C. § 1965(a) because Defendants transact their affairs in the District of Columbia.

## III.     STANDING

54.     The Assignors pay for Eylea as Medicare Part C (or Medicare Advantage) Plan ("MA Plan") sponsors.

55.     Between 2011 and 2021, Assignors have paid more than $18,000,000 for Eylea.

56.     The claims paid for by Assignors involved transactions (and related events) in at least the following states: Arizona, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, Mississippi, Missouri, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Texas, and Washington.

57.     *First*, because the claims for Eylea submitted to Assignors were products of Regeneron's unlawful kickback scheme, they were not payable. Regeneron knew this, and therefore misrepresented and concealed the nature of its financial relationship with and use of CDF and PANF (collectively, the "Charities"), to ensure that claims continued to be paid. Regeneron publicly stated that it did not play a role in funding CDF and PANF, and internal Regeneron emails show that Regeneron executives lied to company auditors who might have uncovered or outed Regeneron's unlawful conduct. Both CDF and PANF also publicly misrepresented their status as

14

independent charities to the OIG and in their tax filings.

58.    *Second*, Defendants' copay scheme defrauded Assignors, tortiously interfered with the contractual relationships between Assignors and their Enrollees, and unjustly enriched Defendants at the direct expense of the Assignors and Class Members. Under the relevant contracts, Assignors' Enrollees were obligated to bear some of the cost of their prescription drugs through co-payments, co-insurance, or deductibles. Defendants incentivized patients to choose Elyea over other drugs by funneling kickbacks to patients to cover the out-of-pocket costs for Eylea. Defendants thus caused Assignors and Class Members to pay for Eylea even though the patients had not met their contractual cost-sharing obligations. In doing so, Defendants improperly eliminated members' contractual incentive to use lower-cost alternatives. The contractual provisions that create this incentive are an essential element of the Assignors' health coverage plans. The provisions encourage patients and prescribers to make cost comparisons when choosing among alternative drugs. The provisions thus promote price competition in the prescription drug market. By nullifying the cost-comparison incentive for its own private benefit, Regeneron's scheme suppressed price competition, harmed private healthcare plans and the Medicare program, and diverted billions of dollars from the nation's taxpayers.

59.    According to one study, if patients used Avastin, which is as safe and effective as Eylea at a fraction of Eylea's cost, Medicare and U.S. taxpayers would save $18 billion over ten years. *See* D. Hutton et al., *Switching to Less Expensive Blindness Drug Could Save Medicare Part B $18 Billion Over a Ten-Year Period*, Health Affairs Vol. 33, No. 6 (2014), *available at* https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2013.0832

60.    *Third*, because Regeneron concealed price concessions (such as credit card rebates) from its mandatory Centers for Medicare & Medicaid Services ("CMS") reporting obligations,

Regeneron was able to inflate the ASP of Eylea. CMS and MA plans relied on reporting data provided by Regeneron in determining the reimbursement rate for Eylea. Because Regeneron did not disclose these price concessions, which would lower Eylea's average sales price, Medicare and MA plans paid for Eylea claims at inflated prices.

### *Assignment Agreements & Exemplars*

61.　　Plaintiffs executed irrevocable assignments of certain defined property and acquired any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments convey legal and beneficial ownership of the identified claims and authorize Plaintiffs to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Plaintiffs allege the below assignments to demonstrate standing.

62.　　On June 26, 2019, **AvMed**, a non-for-profit organization, irrevocably assigned to Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, all rights to recover payments made on behalf of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "AvMed Assignment"). The AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including [MSP Recovery]), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (aal of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

63.    The "Assigned Claims" exclude claims against "[AvMed's] network healthcare providers and current and former members" as well as "[c]laims arising from and related to the GlaxoSmithKline[] manufacturing facility in Cidra, Puerto Rico[.]" Defendants are not AvMed "network healthcare providers" or "current [or] former members" and the claims at issue in this action do not relate "GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico."

64.    The AvMed Assignment also provided for a due diligence period wherein the parties would exchange deliverables and contemplated that the parties would enter into a separate "Stand-Alone Assignment Agreement" further evidencing the assignment. Upon completion of the prescribed due diligence period, and satisfaction of all conditions precedent, the parties finalized the transaction, including the exchange of compensation and execution of the Stand-Alone Assignment Agreement. The AvMed Assignment and Stand-Alone Assignment assigned claims for dates of service up to June 26, 2019.

65.    On December 31, 2020, AvMed irrevocably assigned to Series 17-03-615 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Second AvMed Assignment"). The Second AvMed Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from June 27, 2019, to July 31, 2020. The Second AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to (i) all Quarterly Claims arising from or evidenced in the Quarterly Claims Data, whether based in contract, tort, or statutory right, and all related recovery and receivable rights arising from and related to the Quarterly Claims Data transferred to MSP Recovery, LLC; (ii) any and all causes of action, claims, and demands of any nature whatsoever relating to payments for health care services provided to individuals enrolled under Assignor's Medicare Advantage plan(s) …, and all legal or equitable rights (including, but not limited, to subrogation) to pursue and/or recover monies related to the Quarterly Claims that Assignor had, may have had, or has asserted against any party in connection with the Quarterly Claims Data; and (iii) all causes of action, claims, rights, and demands

of any nature whatsoever, legal or equitable, against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Quarterly Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii) …, except for Assignor's right to recovery, under any theory against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute. The assignment of the Quarterly Assigned Claims is irrevocable and absolute.

66.     On December 28, 2021, AvMed irrevocably assigned to Series 21-12-1644 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Third AvMed Assignment"). The Third AvMed Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from August 1, 2020, through June 30, 2021. The Third AvMed Assignment expressly provides, in pertinent part:

Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Claims arising from or evidenced in the Claims Data transferred to MSP Recovery, LLC commencing with and encompassing dates of service from August 1, 2020 through and including June 30, 2021 (the "Assigned Claims"), except for Assignor's right to recover, under any theory, against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute.

67.     Consideration was given between the parties in executing these agreements.

68.     AvMed paid for Eylea with NDC 61755000502 for patient O. S. (msp_patient_id 12235224) in Florida on 11-04-2015. This payment was made directly to Aran Eye Associates, a health care provider whose patients received copayment assistance from CDF.

69.     Additionally, AvMed paid for Eylea with NDC 61755000502 for patient J. C. (msp_patient_id 12218869) in Florida on 12-30-2011. AvMed also paid for Eylea with NDC 61755000502 for patient R. F. (msp_patient_id 34979654) in Florida on 01-09-2021.

70.     On June 19, 2017, **FCHP**, a not-for-profit organization, irrevocably assigned all

18

legal ownership of certain property and its rights and claims to recovery against any liable entity

(including Defendants) for payments made on behalf of its enrollees pursuant to Medicare law to

MSP Recovery, LLC ("FCHP Assignment"). Specifically, the FCHP Assignment states:

> [FCHP] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [FCHP's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [FCHP] that [FCHP] had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to [FCHP] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

> [FCHP] has certain legal rights to recover payments for the provision of health care services arising from contractual agreements, such as participation and network agreements with applicable capitation and risk sharing arrangements, and state and federal laws that provide for the reimbursement of conditional payments made by the [FCHP], including the right to recover claims for health care services that are billed on a fee for service basis (the "**General Claims**");

> MSP Recovery is in the business of identifying and analyzing Parts A, B and D of [FCHP]'s Medicare, Medicare Advantage and/or Medicaid claims (the "**Medicare/Medicaid Claims**, and together with the **General Claims**, the "**Claims**") and pursuing the recovery of Claims;

71.     On June 20, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired

under the FCHP Assignment to Series 17-04-631, LLC, a designated series of MSP Recovery

Claims, Series LLC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [FCHP] and MSP Recovery, LLC . . .

72.     Consideration was given between the parties in executing these agreements.

73.     FCHP paid for Eylea with NDC 61755000502 for patient C. P. (msp_patient_id

11408176) in Massachusetts on 12-31-2013, 05-20-2014, 08-27-2015. FCHP paid for Eylea with

NDC 61755000502 for patient A. L. (msp_patient_id 12174324) in Massachusetts on 08-02-2016 and 11-10-2016. FCHP paid for Eylea with NDC 61755000502 for patient W. M. (msp_patient_id 12174341) in Massachusetts on 06-14-2016, 08-09, 2016, and 11-15-2016. FCHP paid for Eylea with NDC 61755000502 for patient M. D. (msp_patient_id 12173034) in Massachusetts on 06-02-2016. These payments were made directly to Boston University Eye Associates,[4] a health care provider whose patients received copayment assistance from CDF.

74.     Additionally, FCHP paid for Eylea with NDC 61755000502 for patient G. H. (msp_patient_id 11396072) in Connecticut on 10-22-2018, 12-03-2018, 03-20-2019, and 05-02-2019. FCHP also paid for Eylea with NDC 61755000502 for patient M. T. (msp_patient_id 11408026) in Indiana on 12-03-2018 and 03-01-2019. FCHP paid for Eylea with NDC 61755000502 for patient S. K. (msp_patient_id 11396189) in New Hampshire on 09-19-2012, 03-12-2012, 08-21-2013, 10-21-2013, 12-10-2013. FCHP paid for Eylea with NDC 61755000502 for patient A. K. (msp_patient_id 11393636) in Rhode Island on 09-05-2013 and 11-21-2013.

75.     On March 19, 2019, **HEAL** irrevocably assigned all legal ownership of certain property and its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its enrollees pursuant to Medicare law to MSP Recovery, LLC ("HEAL Assignment"). Specifically, the HEAL Assignment states:

> [HEAL] assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [HEAL's] right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, statutory right, and all related recovery rights arising from the health care claims data transferred to MSP Recovery, and (ii) any and all causes of action and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [HEAL] had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action and rights and claims, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to [HEAL] arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of

---

[4] [*See* **Exhibit 28** – Dr. Siegel Declaration]

the Claims and rights set forth in (i)-(iii), the "Assigned Claims").

[HEAL] has or may in the future have certain legal and equitable rights to seek reimbursement, recover payments and/or seek damages from primary payers and any Other party or entity that may be responsible to [HEAL], including "Responsible Parties,'" whose failure, directly or through rights conferred on the [HEAL] pursuant to state and/or federal law pertaining to beneficiaries, for health care services provided to any of its members or enrollees for the provision of health care services arising either from (i) contractual agreements, which may include but not be limited to agreements with the Centers for Medicare & Medicare Services ("CMS"), along with such other participation and network agreements in place containing applicable capitation and risk sharing arrangements, and/or (ii) state and/or federal laws that provide for the reimbursement of conditional payments made by the [HEAL], whether under Parts A, B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan or otherwise, including the right to recover claims for health care services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights in favor Of [HEAL] against recoveries by enrollees, including in any litigation, such as but not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the forgoing defined as the "Claims".

76.     On April 10, 2019, MSP Recovery, LLC irrevocably assigned all rights acquired under the HEAL Assignment to Series 17-03-583, a designated series of MSP Recovery Claims, Series LLC:

The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively, the "Assigned Claims") as such terms are defined in the Recovery Agreement.

77.     Further, on October 22, 2020, Series 17-03-583 entered into an assignment agreement with Series 44-20-583, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

[Series 17-03-583] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-583] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as

(ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HEAL, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HEAL arising from or relating to the Claims and all information relating thereto.

78.    Pursuant to that certain Assignment Agreement dated May 31, 2023 (the "Assignment"), by and between Series 44-20-583 and Series 23-05-1945, a designated series of MSP Recovery Claims, Series LLC, , Series 44-20-583 irrevocably assigned, transferred, conveyed, set over, and delivered to Series 23-05-1945 (i) any and all of Series 44-20-583's rights, title, ownership, obligations, and interest in and to the Agreement, as well as, (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.  Series 23-05-1945 thereby accepted such Assignment and assumed all of the rights, duties and obligations of the Series 44-20-583 under the Agreement.

79.    Such Assignment also included, but was not limited to, any and all rights of Series 44-20-583 to conduct the prosecution of the Assigned Claims.

80.    Consideration was given between each party in executing these assignments.

81.    HEAL paid for Eylea with NDC 61755000502 for patient N. B. (msp_patient_id 13972094) in Illinois on 10-19-2015, 11-30-2015, 12-21-2015. HEAL paid for Eylea with NDC 61755000502 for patient M. P. (msp_patient_id 13964948) in Illinois on 11-25-2015, 12-16-2015, and 07-26-2018. HEAL paid for Eylea with NDC 61755000502 for patient W. M. (msp_patient_id 13960247) in Illinois on 11-11-2015 and 12-16-2015. These payments were made directly to Marion Eye Centers, a health care provider whose patients received copayment assistance from

CDF.

82.     Additionally, HEAL paid for Eylea with NDC 61755000502 for patient A. M. (msp_patient_id 14133178) in Colorado on 04-01-2015 and 05-12-2015. HEAL also paid for Eylea with NDC 61755000502 for patient L. B. (msp_patient_id 33122419) in Iowa on 03-21-2018 and 06-27-2018. HEAL also paid for Eylea with NDC 61755000502 for patient B. C. (msp_patient_id 33113502) in Missouri on 05-08-2018 and 06-08-2018. HEAL paid for Eylea with NDC 61755000502 for patient H. J. (msp_patient_id 13968907) in Mississippi on 12-18-2017 and 01-25-2018. HEAL paid for Eylea with NDC 61755000502 for patient D. T. (msp_patient_id 14121916) in North Carolina on 11-03-2014 and 01-08-2015. HEAL paid for Eylea with NDC 6175000502 for patient F. B. (msp_patient_id 13970666) in Tennessee on 10-05-2016 and 11-04-2016. HEAL paid for Eylea with NDC 61755000502 for patient V. B. (msp_patient_id 13980822) in Washington on 06-20-2018, 07-18-2018, 08-15-2018, 09-26-2018, and 11-21-2018. HEAL paid for Eylea with NDC 61755000502 for patient G. M. (msp_patient_id 13958259) in Georgia on 06-02-2020, 07-02-2020, 08-06-2020, 09-03-2020, 10-09-2020, and 11-13-2020. HEAL paid for Eylea with NDC 61755000502 for patient F. D. (msp_patient_id 42153926) in Texas on 02-11-2019, 03-25-2019, 05-20-2019, 06-21-2019, 08-02-2019, 09-13-2019, 01-17-2020, 02-28-2020, 05-19-2020, 07-31-2020, and 10-19-2020. HEAL paid Eylea with NDC 61755000502 for patient M. B. (msp_patient_id 42154571) in Minnesota on 12-19-2018, 02-08-2019, 03-29-2019, 05-14-2019, 07-01-2019, 09-03-2019, 10-29-2019, 12-30-2019, and 02-24-2020.

83.     On March 20, 2018, **Emblem**, a not-for-profit organization, irrevocably assigned all legal ownership of certain property and rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to Series 16-08-483, a

designated series of MSP Recovery Claims, Series LLC and to MSP Recovery, LLC ("Emblem

Assignment"). The Emblem Assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable…

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

> [Emblem] has certain legal and equitable rights to seek reimbursement and/or recover payments from primary payers and any other party or entity that may be responsible to [Emblem] directly or through rights conferred on the [Emblem] pursuant to state and/or law pertaining to beneficiaries, for Health Care Services paid to [Emblem]'s Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of made by the [Emblem] for such Medicare services, whether under Parts A. B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan, including the right to recover claims Medicare Health Care Services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights, legal equitable, in favor of [Emblem], including in any litigation, such as bill not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the foregoing defined as (the "**Medicare Recovery Claims**;").

84.     The "Medicare Recovery Claims" assigned to Series 16-08-483includes Emblem's

"legal and equitable rights to seek reimbursement and/or recover payments from primary payers .

. . responsible to [Emblem] directly or through rights conferred on [Emblem] pursuant to state

and/or federal law pertaining to beneficiaries, for Health Care Services provided to [Emblem's]

Medicare (as defined above) enrollees arising under state and/or federal laws, including common

law subrogation theories, that provide for the reimbursement of payments made by [Emblem] . . . pursuant to a Medicare Advantage Plan[.]" *Id.* at p. 1.

85.    The "Assigned Medicare Recovery Claims" included the above-referenced Medicare Recovery Claims but excluded "Medicare Recovery Claims that [could] be asserted against Assignor's members, enrollees and/or contracted providers" and Medicare Recovery Claims that as of March 20, 2018 (the Effective Date of the agreement) had been assigned to and/or were being pursued "by other recovery vendors" for services rendered within a defined six-year time period. *Id*. These excluded claims are defined in the Emblem Assignment as "Assignor Retained Claims." *Id*. None of these Retained Claims are implicated here.

86.    On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the Emblem Assignment to Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC ("MSPRC Assignment"). The MSPRC Assignment from MSP Recovery, LLC to Series 16-08-483, which was ratified and approved by Emblem, states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of … and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, **Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC,** a Delaware Series Limited Liability Company, and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" "Assigned Medicare Recovery Claims" and "Assigned Documents" (and all proceeds and products thereof) as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

87.    Consideration was given between the parties in executing this assignment.

88.    Emblem paid for Eylea with NDC 61755000502 for patient D. M. (msp_patient_id 8803383) in New York on 11-13-2014, 07-15-2015, 05-10-2016, 02-24-2017, 06-09-2017. Emblem paid for Eylea with NDC 61755000502 for patient D. K. (msp_patient_id 8822476) in New York on 05-23-2013. These payments were made directly to Retina Associates of New York,

P.C., a health care provider whose patients received co-payment assistance from CDF.

89.     Additionally, Emblem paid for Eylea with NDC 61755000502 for patient P. K. (msp_patient_id 8802677) in Arizona on 03-10-2015 and 09-16-2016. Emblem also paid for Eylea with NDC 61755000502 for patient A. C. (msp_patient_id 8816193) in New Jersey on 12-10-2013 and 07-08-2014.

## IV.    BACKGROUND

### *Regulatory Background*

90.     In 1965, Congress amended the Social Security Act to create the Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled. The Medicare Act consists of five parts—Parts A, B, C, D, and E. Parts A and B create, describe, and regulate traditional fee-for-service, government-administered Medicare.

91.     The federal government administers Parts A and B through CMS. Part A covers inpatient hospital services, skilled nursing facility services, and some forms of home-based care. Part B covers physician services, outpatient hospital services, diagnostic services, and other medical services. Parts A and B also cover drugs delivered during medical procedures, and Part B specifically pays for drugs provided incident to treatment at a physician's office (called "clinically administered drugs"), so long as the drugs are used consistent with FDA approval or in another medically accepted manner.

92.     Individuals who are eligible for Part A and enrolled in Part B have the option of enrolling in Medicare Part C, otherwise known as Medicare Advantage, which is required to offer the same benefits covered by Parts A and B, and typically covers outpatient prescription drugs. CMS offers Medicare Advantage plans through private payors, like the Assignors, known as Medicare Advantage Organizations.

26

93.     Assignors provide Medicare benefits under Parts C and D. Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. Part D provides for prescription drug coverage to Medicare beneficiaries.

94.     The Assignors offer and administer Medicare Advantage plans that provide the types of benefits discussed above, including coverage of Eylea, as it is a clinically administered drug. While Eylea is predominantly reimbursed through Part C, at times it may be reimbursed through a pharmacy under Part D.

95.     In offering and administering these Medicare Advantage plans, the Assignors bear risks related to the cost and utilization of healthcare services and pharmaceuticals. When Assignors assume these risks, they rely in large part on the protections afforded by state and federal law prohibiting unlawful conduct within the healthcare industry, including laws prohibiting the submission of false, fraudulent, or otherwise unlawful claims.

96.     The Assignors' Medicare Advantage plans include cost provisions, which require that the beneficiary pay a percentage of the cost of drugs, such as Eylea, subject to an annual cap. These cost-sharing provisions are a crucial factor in managing healthcare costs. *See United States v. Teva Pharmaceuticals USA, Inc.* 560 F.Supp.3d 412, 416 (Mass. Sept. 9, 2021) ("Those partial payments ("copays") are intended to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed health care products and to encourage drug manufacturers to price their products upon market forces").

97.     As the Department of Health and Human Services, Office of the Inspector General observed in a 1994 Special Fraud Alert, "[s]tudies have shown that if patients are required to pay even a small portion of their care, they will be better healthcare consumers, and select items or

services because they are medically needed, rather than simply because they are free." *Available at* https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html

98.     Medicare Advantage plans and other Part C entities play an important role in the American healthcare landscape. They provide millions of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation."

99.     In 2017, 33% of Medicare-eligible individuals got their health insurance from MA Plans. In 2021, that figure rose to 42% and will likely rise further in the coming years.[5] "In 2022, more than 28 million people are enrolled in a Medicare Advantage plan, accounting for nearly half or 48 percent of the eligible Medicare population, and $427 billion (or 55%) of total federal Medicare spending (net of premiums)."[6]

100.    Medicare Advantage entities cannot play the vital role that Congress intended if they are hamstrung by a competitive disadvantage. When Medicare Advantage entities "faithfully pursue and recover from liable third parties," they "will have lower medical expenses and will therefore be able to provide additional benefits to their enrollees." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d 353, 363 (3d Cir. 2012) (quoting Policy and Technical Changes to Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19678, 19797 (April 15, 2010)).

---

[5] Meredith Freed, *Medicare Advantage in 2021: Enrollment Update and Key Trends*, June 21, 2021, Kaiser Family Foundation. Available at: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2021-enrollment-update-and-key-trends/.

[6] *See* Medicare Advantage in 2022: Enrollment Update and Key Trends: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2022-enrollment-update-and-keytrends/#:~:text=In%202022%2C%20more%20than%2028,spending%20(net%20of%20premiums).

***Medicare Participation: Conditions, Certifications, and Mandatory Price Reporting and Payment Basis***

<u>*Medicare Supplier Participation Requirements*</u>

101.   As a condition of participating in Medicare, provides and suppliers of medical services and items—*including drug manufacturers who supply covered medications indirectly*—must enroll with Medicare to be eligible to receive any payment for their items or services through Medicare. 42 C.F.R. § 424.505. To enroll in Medicare, all providers and suppliers must submit an enrollment application to CMS and must "attest[] that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 C.F.R. § 424.510(d)(3). Medicare providers and suppliers must also certify that they "understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act))."[7]

102.   Providers also submit claims for Medicare beneficiaries to the government and to payors, like the Assignors, using a standard claim form, the CMS 1500, which requires the provider to certify that each claim "complies with all Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback statute."

103.   The application forms used by all providers and suppliers to enroll in Medicare includes the following attestation: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in . . . this application. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction

---

[7] CMS Form 855I.

complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)).”[8]  (emphasis added).

104.    Entities submitting claims to Medicare are subject to mandatory exclusion from Medicare by HHS-OIG if criminally convicted of an AKS violation, *see e.g.,* 42 U.S.C. § 1320a-7(a)(1), and subject to permissive exclusion if HHS-OIG determines that the entity “has committed an act” described in the AKS, 42 U.S.C. § 1320-7(b)(7).

105.    The AKS was enacted to protect the “public's confidence in the government” because the government is harmed by bribery even absent any financial harm. *See United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (citing *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961)). Defendants are routinely held liable for abusing this trust relationship,[9] and the federal government has emphasized the necessity of “closely scrutiniz[ing]” renumerations relating to the recommendation of medical products” because it involves “exceptional position[s] of public trust[.]” Re: OIG Advisory Opinion No. 11-08, 2011 WL 4526111, at *4.

106.    The AKS arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are excessively costly, medically unnecessary, of poor quality, or potentially harmful to patients. Congress determined that the inducements at issue would “contribute significantly to the cost” of

---

[8]    Medicare   Enrollment   Application,   CMS   Form   855I,   Available   at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf.   *See   also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.
[9] *See, e.g.*, *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) (“[A]s medical equipment suppliers, [defendants] were in positions of trust with respect to Medicare.”); *United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (holding that defendant who violated the AKS held a position of trust); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) (“[False] claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system.”) (cleaned up).

federal health care programs absent federal penalties as a deterrent. H.R. Rep. No. 95-393, at 53 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3056.

107.    Federal and state laws, including the AKS, prohibit pharmaceutical manufacturers from paying the cost-sharing obligation of the patient receiving their drug. Specifically, the AKS makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b).

108.    Because Medicare Advantage is a "Federal healthcare program" as defined by 42 U.S.C. § 1320-7b(f), pharmaceutical manufacturers, like Regeneron, who obtain payment for their drugs through any Medicare Advantage plan—including Assignors—must comply with the AKS, and other state and federal law.

109.    A pharmaceutical manufacturer's payment, or waiver, of patients' cost-sharing obligations, including by using "charities" as conduits, violates the AKS when the patient is enrolled in Medicare Parts A, B, C, or D.

110.    Like the AKS, several state laws prohibit similar unlawful conduct involving health insurance transactions, namely: (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Mo. Rev. Stat. § 191.905; (6) 5 R.I. Gen. Laws § 5-48.1-3; and (7) Tex. Occ. Code Ann. § 102.001.

*Mandatory Manufacturer Price Reporting*

111.    In addition to the certification discussed above, pharmaceutical manufacturers that sell Part B, and by extension Part C, drugs are required to report price/sales data to CMS on a quarterly basis.

112.    Medicare Part B pays providers a statutorily determined reimbursement rate for

physician-administered drugs that is set at 106% of the drug's reported Average Sales Price (i.e., ASP+6%). 42 C.F.R. § 414.904.3 CMS then publishes the Medicare payment rate, also called a "payment limit," and sends them to Medicare contractors for claims processing, prior to the next quarter. *See, e.g.*, Average Sales Prices: Manufacturer Reporting and CMS Oversight, HHS-OIG Report, pp. 3-4 (Feb. 2010), https://oig.hhs.gov/oei/reports/oei-03-08-00480.pdf; CMS Manual System, Pub 100-04 Medicare Claims Processing, Transmittal 12422, April 2024 Quarterly Average Sales Price (ASP) Medicare Part B Drug Pricing Files and Revisions to Prior Quarterly Pricing Files, https://www.cms.gov/files/document/r12422cp.pdf.

113.    The average sale price ("ASP") is statutorily defined as the "manufacturer's sales to all purchasers…in the United States for such drug or biological in the calendar quarter; divided by [] the total number of such units of such drug or biological sold by the manufacturer in such quarter." 42 U.S.C. § 1395w-3a(c)(1)(A)-(B).

114.    The ASP "shall include volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, and rebates…" *Id*. 1395w-3a(c)(3). The statute continues: "For years after 2004, the Secretary may include in such price other price concessions…that would result in a reduction of the cost to the purchaser. *Id*.

*Price Concessions and the Statutory Formula*

115.    CMS requires manufacturers to submit ASP reports on a quarterly basis, no later than thirty days after the close of the previous quarter. 42 C.F.R. § 414.804(a)(5).

116.    These ASPs are published in several industry compendia that health plans use in negotiations.

117.    In calculating the manufacturer's ASP, a manufacturer must take the total amount of revenue for a product, deduct all price concessions from the total sales and then divide the total

revenue minus concessions by the number of units sold of the pharmaceutical.

118.    Price concessions include the following types of transactions and items, volume discounts; prompt pay discounts; cash discounts; free goods that are contingent on any purchase requirement; and chargebacks and rebates.

119.    For purposes of paragraph (a)(2)(i) bona fide services fees are not considered price concessions. 48 C.F.R. § 414.804(a)(2).The regulations define bona fide service fees ("BFSF") as fees paid by a manufacturer to an entity, that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and that are not passed in whole or in part to a client or customer of an entity, whether or not the entity takes title of the drug. 48 C.F.R. § 414.802.

120.    Failure to follow these intricate requirements has catastrophic consequences including the submission of false prices that form the basis of Medicare payments.

121.    Payment for third party financial fees associated with providers' procurement of a drug is not a service that a manufacturer would otherwise perform or contract for, rather, such payments are price concessions.

*Medicare Payment Basis*

122.    The payment for drugs under Part B is determined by statute. 42 U.S.C. § 414.904.

123.    When Regeneron submitted the statutorily defined and required ASP during the pendency of the scheme, Regeneron certified that their ASP for the term was the amount submitted by Regeneron.

124.    However, Regeneron systematically reported higher ASP's than what is statutorily allowed because they failed to disclose millions of dollars in credit card rebates as price concessions, which would have lowered the reimbursement rate of and total revenue for Eylea.

125.    Had Regeneron followed the statutory formula and deducted all price concessions, this would have resulted in a lower ASP being submitted for Eylea.

126.    Because Part B drug reimbursement rates are determined using the ASP + 6% formula, an inflated ASP would necessarily result in overpayments for the particular drug. One way that a pharmaceutical manufacturer could inflate the ASP of its own drug is by withholding data regarding its price concessions.

127.    Pharmaceutical manufacturers, such as Regeneron, know that CMS publishes ASP calculations based on the manufacturer's reports, and that MA plans rely on those reports when negotiating the price of a given product. As a result, the publishing of false pricing lists that form the bases of price negotiation caused negotiations to begin at an inflated amount than had the price been submitted according to the statutorily defined formula.

*OIG Guidance for Co-Payment Charities and Donors*

128.    The federal government, through the Office of Inspector General ("OIG"), has provided guidance to co-payment charities about compliance with applicable laws and regulations, including the AKS and FCA. The OIG has made clear that such charities will violate those laws and regulations if they do not follow the specified rules and/or guidance. Those rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity or receive information from such a charity that would allow the manufacturer to link the amount it donates to additional profits from the sale of a particular drug.

129.    For example, November 22, 2005, the Office of Inspector General of the Department of Health and Human Services ("HHS OIG" or "OIG") released an advisory bulletin applicable to all patient assistance programs for Medicare Part D enrollees ("PAP") (the "2005 PAP Bulletin"). 70 Fed. Reg. 70623 (Nov. 22, 2005). "That 2005 PAP Bulletin provided guidance,

in anticipation of Medicare Part D taking effect in 2006, to entities operating PAPs." *Patient Servs., Inc. v. United States*, 2019 WL 267872, at *4 (E.D. Va. Jan. 18, 2019).

130.    The OIG warned it would be a violation of the AKS and other laws for a drug manufacturer to knowingly provide subsidies to Part D beneficiaries taking its product. The OIG identified criteria for PAPs and manufacturers to avoid "potentially abusive PAP structures," and to ensure any donations from manufacturers, for Part D beneficiaries, were provided through "bona fide"[10] independent charities.

131.    The OIG explained that failure to abide by its regulations will result in "increasing costs to Medicare" and "reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs." Circumventing "cost-sharing subsidies" would "shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices." Failure to abide by its regulations would "have the practical effect of locking beneficiaries into the manufacturer's products, even if there are other equally effective, less costly alternatives[.]"

132.    Recognizing the potential for extraordinary profits that could be garnered through abuse, "the OIG expressed concern[] . . . manufacturers may seek improperly to maximize these profits by creating sham 'independent' charities to operate PAPs; by colluding with independent charity programs . . . ; or by manipulating . . . eligibility criteria to maximize the number of beneficiaries[.]" 70 Fed. Reg. 70623-03. "Simply put, the . . . PAP must not function as a conduit for payments by the . . . manufacturer to patients[.]"

133.    Finally, the OIG identified specific procedures for entities seeking an "Advisory

_____

[10] As explained, "[the OIG] would not consider a charitable foundation . . . formed, funded or controlled by a manufacturer . . . to be a bona fide, independent charity[.]" 70 Fed. Reg. 70623-03.

Opinion" from the OIG.[11] 70 Fed. Reg. 70623-03.

134.    Accordingly, the 2005 Bulletin set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following "Five Requirements":

    a.  No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

    b.  The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;

    c.  The PAP awards assistance based on a reasonable verifiable, and uniform measure of financial need applied in a consistent manner; and

135.    The drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. Id. at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices."). *Id*.

136.    Since 2005, the OIG has publicly disseminated multiple Special Advisory Bulletins (including in 2006, 2011, 2014 and 2015).

137.    For instance, in 2014, the OIG issued a Supplemental Bulletin relating to "indirect remuneration" provided by drug companies. *See* 79 Fed. Reg. 31120-31123 (May 30, 204). The OIG reiterated, that "[i]f a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to influence the patient to purchase (or induce the patient's physician to prescribe) certain items", the "[AKS] could be violated." *Id*. The OIG further stated

---

[11] As explained by the PAP in *Patient Servs., Inc.*, 2019 WL 267872, at *8, "operating without an [A]dvisory [O]pinion is practically impossible"; therefore, to successfully operate within the Part D framework, it is essential for a PAP to convince the OIG to endorse its operations.

that independent charities were prohibited from "giv[ing] a donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services, or the volume of those products supported by the PAP." *Id*.

### Abusing Copay Assistance to Induce Patient and Physician Decisions and Boost Profits[12]

#### Regeneron's Copay Assistance Induced Patients and Physicians to Utilize Eylea

138.    It is common sense that patients will not purchase, nor will physicians prescribe, medication if the patient cannot afford it. In fact, "patients with higher levels of cost-sharing are more likely to delay or forgo prescription medications" or "not take medication as prescribed"[13]

139.    Indeed, it is "widely understood that high co-payments are a leading cause [of prescription abandonment], and lowering co-payments significantly reduces abandonment for highly effective chronic treatments."[14] The Congressional Budget Office ("CBO") referred to this phenomenon as the "use effect", which captures the changes in demand for drugs resulting from changes in beneficiaries' out-of-pocket expenses.[15]

140.    In the context of PAP contributions, "that donations induce utilization is not surprising: Cost sharing is known to reduce utilization, so defraying it should logically induce

---

[12] Note: the allegations in this section, and the following sub-sections are merely a sample of Plaintiff's supporting evidence and allegations. A more detailed discussion is provided below.

[13] Report to Congress, *Prescription Drugs: Innovation, Spending, and Patient Access* (Dec. 7, 2016) https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//192456/DrugPricing RTC2016.pdf

[14] Dana P. Goldman et al., *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health*. 298.1 Jama 61, 61–69 (2007), *available at* https:// www.ncbi.nlm.nih.gov/pmc/articles/PMC6375697//

[15] Congressional Budget Office, *Prescription Drugs: Spending, Use, and Prices* (Jan. 2022), *available at* https://www.cbo.gov/publication/57772#_idTextAnchor027 ("The reduction in consumers' out-of-pocket costs for prescription drugs is one key factor that explains the increased use of prescription drugs.").

some portion."[16] Other studies on the effects of copay assistance found increases for "branded drug sales by over 60%[.]"[17]

141.    Even PANF's CEO, David Klein, admitted, "patients would be much more likely to start and stay on treatment if they were not stymied by high out-of-pocket costs."[18]

142.    Similarly, in December 2011, Regeneron recognized that its "products [are] too costly for many patients to afford them, and physicians may not prescribe them." From the outset, Regeneron management understood that without copay assistance for Eylea, physicians would prescribe and purchase Avastin rather than Eylea.

143.    To thwart patients abandoning Eylea treatment and/or opting for Avastin, a far cheaper alternative, Regeneron leveraged PAPs (PANF and CDF) to induce patients to start and/or stay on Eylea.

144.    Additionally, Cynthia Sherman, a Senior Director of Reimbursement at Regeneron testified as follows:

> Q: But people understood that if co-pay assistance was not available for Eylea or Lucentis patients, that patients with wet AMD would end up on Avastin?
>
> A: Yeah, that's why they wanted to have a managed care co-pay program.

145.    "Regeneron executives believed that by providing co-pay assistance, Regeneron would induce sales of Eylea that otherwise would not have occurred." *Id*. ¶ 96. "Indeed, at least one Regeneron employee opined directly that generating sales of Eylea was 'a purpose' of delivering co-pay assistance." *Id*. ¶ 97.

---

[16] *Giving a Buck or Making a Buck? Donations by Pharmaceutical Manufacturers to Independent Patient Assistance Charities*, Health Affairs, Nurses, Care Delivery, Pharmaceuticals, & More 41, No. 9 (2022).
[17] *Id*.
[18] *See* The House Committee on Oversight and Reform, "*Drug Pricing Investigation Majority Staff Report*", (December 10, 2021).

146.    The DOJ's investigation also uncovered that "[m]ultiple physicians have attested to their hesitance to saddle patients with costly co-pays, given the availability of the far cheaper alternative (Avastin)." Further, "physicians do not wish to encumber their practices with unpaid co-pay obligations, which is an issue for buy-and-bill drugs, like Eylea." *Id*. ¶ 160.

147.    Regeneron's own medical expert, Dr. Slizard Kiss, testified that ophthalmologists' prescribing decisions "may be altered, based on other decisions", including the drug's "cost." *Id*. ¶ 161. When holding himself out as an expert on behalf of Regeneron in another litigation, Dr. Kiss swore a declaration that described cost as among "the primary drivers of ophthalmologist prescribing decisions." *Id*. ¶ 162.

148.    Additionally, Regeneron paid millions of dollars to cover physician credit card fees associated with Eylea purchases and provided free inventory of Eylea, inventory refrigeration systems, and expensive cloud-based inventory processes.

149.    Regeneron understood that credit card rebates gave Eylea an unfair advantage over Avastin and Lucentis. An internal Regeneron document titled "Eylea New Hire Training" from May 2015, observed "Doctors can purchase Eylea from Besse, CuraScript and McKesson with the option to use credit cards"—*i.e.*, without a fee—and "Genetech does not subside[sic] credit card use thru Besse, McKesson or CuraScript (or any other distributor)."

150.    Regeneron knew that reporting the credit card rebates as price concessions would lower the ASP of Eylea.

151.    Regeneron was required to report to the credit card fees as price concessions to CMS but failed to do so.

152.    Accordingly, Regeneron inflated the reimbursement rate for Eylea, resulting in Medicare and MA plans, like the Assignors, paying significantly more for Eylea than they

otherwise would have for each prescription.

## V.    FACTUAL ALLEGATIONS

### *The Formation of CDF*

153.    In 2006, just after Medicare Part D went into effect, CDF sought an Advisory Opinion from the OIG. To do so, CDF used the wire or mail to request OIG approval to operate as a 501(c)(3) organization providing copayment assistance to Medicare beneficiaries.

154.    CDF certified that it would, at all times, adhere to the Five Requirements when administering copayment assistance to Medicare beneficiaries.  Particularly, CDF promised it would (1) not allow any drug manufacturer to "exert[] any direct or indirect influence or control over" it; (2) award assistance regardless of the drug manufacturer's interests, or the drug involved; (3) award assistance in a uniform and consistent manner; and (4) not provide any drug manufacturer with data "that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products."

155.    In 2006, the OIG issued a favorable Advisory Opinion to CDF.  The OIG explicitly "relied upon" CDF's certifications and promises when it endorsed, approved, and allowed CDF to operate under the guise of a charitable organization, as will be discussed. [**Exhibit 1**, CDF's 2006 Advisory Opinion].

156.    Before long, drug manufacturers began pouring millions into CDF and CDF began pocketing a percentage of every contribution made. Thus, the more money CDF received, the more its executives pocketed for themselves.

157.    For example, in 2008, CDF received a total of $90,257,017 in contributions and grants. By 2012, CDF reported total contributions and grants in the amount of $200,401,801. That same year, CDF paid $517,782 in executive compensation. By 2019, CDF reported receiving a

total of $272,663,929 in contributions and grants, while paying its executives $1,000,832 in compensation, with two executives—Clorinda Walley and Odebralsi Randall—accounting for over half the total compensation. [**Exhibit 2,** CDF's Form 990 Tax Filings].

158.    Furthermore, CDF's 990 demonstrates that documents and disclosures related to the copay scheme—such as amounts subsidized, dates, patient names, etc.—are in the possession and exclusive control of CDF. For example,

> "(2) The individual receives a prescription from their doctor for an FDA-approved drug for treatment of the disease (3) the individual contacts the Chronic Disease Fund seeking financial assistance for the purpose of paying the co-pay for the medication prescribed by their doctor and (4) The Chronic Disease Fund verifies that the individual's income is low enough to qualify for financial assistance…the Organization ensures that all grants and other assistances are only used to pay for the prescribed treatment by reimbursing qualifying individuals upon documentation of the purchase and cost of the prescribed medication."

*Id*.

### *The Formation of PANF*

159.    Similarly, in 2006, PANF sought an Advisory Opinion from the OIG. To do so, PANF used the wire or mail to request OIG approval to operate as a 501(c)(3) organization providing copayment assistance to Medicare beneficiaries.

160.    PANF certified that it would, at all times, adhere to the Five Requirements when administering copayment assistance to Medicare beneficiaries.  Particularly, PANF promised it would (1) not allow any drug manufacturer to "exert[] any direct or indirect influence or control over" it; (2) award assistance regardless of the drug manufacturer's interests, or the drug involved; (3) award assistance in a uniform and consistent manner; and (4) not provide any drug manufacturer with data "that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products."

161.    In 2007, the OIG issued a favorable Advisory Opinion to PANF.  The OIG explicitly "relied upon" PANF's certifications and promises when it endorsed, approved, and

allowed PANF to operate under the guise of a charitable organization, as will be discussed. [**Exhibit 3,** PANF's 2007 Advisory Opinion].

162. In 2011, PANF sought and obtained a Modified Advisory Opinion from the OIG. The OIG explained that PANF's approval to operate as a 501(c)(3) organization providing copayment assistance to Medicare beneficiaries was based upon PANF's certifications and promises to adhere to the Five Requirements outlined in the 2005 Special Bulletin. [**Exhibit** 4, 2011 Advisory Opinion].

163. Before long, drug manufacturers began pouring millions into PANF and PANF began pocketing a percentage of every contribution made. Thus, the more money PANF received, the more its executives pocketed for themselves.

164. For example, PANF has had two presidents since 2011: Patrick L. McKercher and Daniel Klein. Mr. McKercher left his role as President and Mr. Klein began as President in November of 2014. Mr. McKercher and Mr. Klein were among a handful of executives whose compensation is set forth in Part VII of PANF's annual Form 990 Tax Filings.  PANF's Form 990 Tax Filings demonstrate that the total reported compensation between McKercher and Klein rose by more than 320% between 2011 and 2016, from $89,000 in 2011 to over $377,000 in 2016. Patrick L. McKercher, the President of PANF received compensation of $89,015 in 2011. By comparison, in 2012, he received compensation to the tune of $254,272. In 2015, President Daniel Klein received a compensation of $301,212. [**Exhibit 5**, PANF's Form 990 Tax Filings].

165. This salary increase has a direct correlation to the amounts of donations PANF received from pharmaceutical manufacturers, like Regeneron. PANF's contributions and grants increased from $89 million in 2011, to $179 million in 2012, to more than $800 million in 2015. *Id*.

166.     Furthermore, PANF's 990 demonstrates that documents and disclosures related to the copay scheme—such as amounts subsidized, dates, patient names, etc.—are in the possession and exclusive control of PANF. For example,

> "These funds represent grants made for the benefit of patients. Through an application process which includes income attestation with random verification against criteria set by the board, a doctor's attestation to validate the patient medical need and an insurance benefits verification, [PANF] ensures that all patients who request our services meet the criteria for a disease fund before any funds are disbursed. The patient's grant will provide assistance for their responsibility (deductible, co-payment, or coinsurance) for covered medication services after payment from the primary insurance or the amount available to each patient is limited by a cap set by the board. Funds are disbursed to the pharmacy or physician's office, when possible, since we want to ensure that the patient does not need to provide funds out-of-pocket for their medications."

*Id.*

### *PANF Creates the Strategic Advisory Committee ("SAC"), Joined by Lash Group, Genentech, Xcenda, & Others Before Working with Regeneron*

167.     Upon information, in 2010, PANF created the SAC comprised of pharmaceutical industry stakeholders, including several Defendants listed here, as they are interrelated to PANF and Genentech, given Genentech is a known Lash client.[19]

168.     Upon information and belief, the SAC met in 2011, in Washington, D.C, PANF's place of residence.

169.     Upon information and belief, the 2011 meetings included representatives from PANF, Genentech, and Xcenda.

170.     Upon information and belief, the SAC was created for PANF and the SAC members to discuss future opportunities.

171.     Upon information and belief, members of the SAC created a means of

---

[19]  Patient Access Network Foundation, 2010 Annual Report, page 21, available at: https://www.panfoundation.org/app/uploads/2019/12/2010panfannualreport.pdf (last visited June 24, 2024).

communication so that members would be alerted of developments in the continuing scheme outside of pharma-controlled communication systems.

172.    Upon information and belief, the purpose of these meetings was to discuss the successful strategies SAC members had employed in implementing each member's copayment circumvention efforts and to discuss whether the industry or the government had inquired about these efforts.

173.    Upon information and belief, health plans, such as Plaintiffs' Assignors, were not members of the SAC.

174.    Upon information and belief the meetings of the SAC allowed PANF, Lash, Genentech, and Regeneron to design, implement, and continue the very scheme Plaintiffs complain of herein.

### *The Commercial Launch of Elyea*

175.    Eylea is a physician-administered injectable drug that treats a form of macular degeneration called Neovascular Age-Related Macular Degeneration, commonly known as Wet AMD.

176.    Wet AMD is a retina degenerative macular disease that leads to gradual vision impairment, and which mainly affects the elderly.

177.    The most common treatment for Wet AMD is the administration of anti-vascular endothelial growth factor ("anti-VEGF") treatments.

178.    In November 2011, the FDA approved Eylea as an anti-VEGF inhibitor for the treatment of Wet AMD. At the time of Eylea's commercial launch into the Wet AMD market, Eylea had two primary anti-VEGF competitor drugs: Avastin and Lucentis, both manufactured by Genentech.

179.    Although Avastin is not FDA-approved to treat Wet AMD, it is widely accepted by

ophthalmologists as a safe and effective treatment for Wet AMD. Anti-VEGF Treatments, American Academy of Ophthalmology (July 26, 2023), https://www.aao.org/eye-health/drugs/anti-vegf-treatments (citing CATT Research Group, Ranibizumab and Bevacizumab for Neovascular Age-Related Macular Degeneration 364 New Engl. J. Med. 1897-1908 (2011); J Clay Bavinger, et al., Comparative Risk of Endophthalmitis After Intravitreal Injection with Bevacizumab, Aflibercept, and Ranibizumab, 39 Retina. 2004-2011 (2019).

180.    During the relevant time period, doctors have submitted, and Medicare has paid, for millions of claims for the administration of Avastin for Wet AMD.

181.    Indeed, many physicians and patients actually prefer Avastin over other forms of Wet AMD treatment, given its effectiveness and $55 cost. [*See, e.g.,* **Exhibit 6,** Department of Health and Human Services, Medicare Payments for Drugs Used to Treat Wet Age-Related Macular Degeneration].

182.    Regeneron knew this. In its 2011 and 2012 10-K Reports, Regeneron identified Avastin as a "significant competitive challenge" given that Avastin is both effective in treating wet AMD patients and is 3% the price of Eylea.

183.    On November 21, 2011, Regeneron announced the commercial launch of Eylea, pricing it at $1,850 per injection.

184.    Physicians typically administer Eylea by injecting the drug into patients' eyes at the physician's practice on an outpatient basis.

185.    Eylea is a "buy-and-bill" drug. Typically, "buy-and-bill" drugs are purchased by physicians and their practices upfront. Once Elyea is administered to a patient, the physician then submits a claim for payment to Medicare or other payors.

***Distribution of Eylea***

186.     When Regeneron launched Eylea, it opted against selling the drug directly to retina practices. Instead, it contracted with distributors and sold Eylea to them at its wholesale acquisition cost ("WAC"), which was $1,850 per vial. Regeneron paid a fee to those distributors for services related to the distribution of Eylea, including "Customer Service," "Warehouse & Distribution," "Returns Management," "Finance," "Information Technology & Reporting," and "Chargeback Management."

187.     To distribute Eylea, Regeneron initially entered into distribution contracts with Besse Medical ("Besse"), McKesson Corporation ("McKesson"), and CuraScript SD Specialty Distribution ("CuraScript") (collectively referred to as "Distributors").

188.     Retina surgeons, injecting ophthalmologists, and their practices (referred to herein as Eylea "customers" or "retina practices") purchased Eylea from the Distributors.

189.     As Regeneron explained in its 2012 10-K,

We sell EYLEA in the United States to three distributors and several specialty pharmacies…Under these distribution models, the distributors and specialty pharmacies generally take physical delivery of product. For EYLEA, the distributors and specialty pharmacies generally sell the product directly to healthcare providers…

### The Co-Pay Scheme

190.     In or around May of 2011 (several months prior to FDA approval of Eylea), Xcenda, part of AmerisourceBergen Consulting Services and a member of the SAC, provided consulting services and "strategic recommendations" regarding pricing and marketing strategies for Eylea. [**Exhibit 7**, Exposure Analysis for VEGF Trap-Eye; *see also,* **Exhibit 8**, Robert Davis Deposition Excerpts].

191.     Xcenda recommended that Regeneron set the price for Eylea at $1,950 per injection.

192.     Knowing that 92% of patients seeking treatment for Eylea were Medicare-eligible

beneficiaries, and knowing that such beneficiaries were required to pay approximately 20% of the price of Eylea under Medicare's cost-sharing or co-pay requirements, Xcenda advised and encouraged Regeneron to partner with "independent" 501(c)(3) charities that provide patient assistance to Medicare beneficiaries. [*Id.; see also,* **Exhibit 9**, DOJ Expert Report, Dr. Leemore Dafny explaining that providing co-pay subsidies for a particular drug increases the likelihood that patients will agree to take that drug].

193.    Below is a graph from the Xcenda slide deck shown to Regeneron in 2011.



194.    As is clear from the above graph, Xcenda informed Regeneron that over half of the anticipated market for Eylea were individuals over the age of 80, who are largely no longer in the workforce. Given these individuals are not in the workforce, it would be nonsensical to assume non-working individuals to have an additional $300 of income available for Eylea copayments.

195.    In July 2011, following Xcenda's May 2011 Presentation, CDF provided Regeneron's management with a copy of CDF's favorable Advisory Opinion. [**Exhibit 10,** Sherman Email – July 28, 2011]. Regeneron's senior executives and managers previously testified that, prior to making payments to CDF, they had reviewed and understood the mandates outlined

in CDF's Advisory Opinion, as well as the OIG's 2005 Special Bulletin. [**Exhibit 8**, Davis Deposition Excerpts; **Exhibit 11**, Schleifer Deposition Excerpts; **Exhibit 12**, Holly Deposition Excerpts – discussing the training provided to Regeneron's management during the time of the scheme].

196.    In or around August 2011, following the strategies provided by Xcenda, Regeneron created the Eylea Patient Assistance Program ("EYLEA 4U"). [**Exhibit 13**, Trade And Distribution Presentation].

197.    EYLEA 4U was established, among other things, to "educate patients and providers", "[m]inimize reimbursement obstacles", and refer patients to Copay Assistance Foundations.

198.    Regeneron partnered with the Lash Group to serve as the administration for EYLEA 4U (otherwise known as Regeneron's "HUB").

199.    Lash Group is a subsidiary of AmerisourceBergen Corporation ("ABC"), "the largest provider of reimbursement services *that assist pharmaceutical companies* in supporting access to branded drugs. [They] also provide . . . *patient assistance and copay assistance programs* . . . and other market access programs to pharmaceutical companies."

200.    On November 22, 2011, ABC[20] (also the largest distributor of Eylea), made the following announcement:

> On November 1, 2011, we acquired TheraCom, LLC ("TheraCom"), a subsidiary of CVS Caremark Corporation, for a purchase price of $250.0 million, subject to a working capital adjustment. TheraCom is a leading provider of commercialization support services to the biotechnology and pharmaceutical industry, specifically providing reimbursement and patient access support services. TheraCom's capabilities complement those of the Lash Group and will significantly increase the

---

[20] That year, ABC considered itself to be "the largest provider *of reimbursement services that assist pharmaceutical companies* in supporting access *to branded drugs*. We also provide . . . *patient assistance and copay assistance programs* . . . and other market access programs *to pharmaceutical companies*."

size and scope of consulting services being provided by our ABCS operating segment. TheraCom's annualized revenues are approximately $700 million, the majority of which are provided by the specialized distribution component of the integrated reimbursement support services for certain unique prescription products.[21]

201.    ABC also announced a $40.3 million increase in revenue "primarily due to the strong performance of the Lash Group, which provides commercialization support services to pharmaceutical and biotechnology manufacturers."

202.    As administrator of EYLEA 4U, the Lash Group (an ABC company) was responsible for, among other things, coordinating and facilitating patient co-payment assistance with Besse (an ABC company and Regeneron's primary distributor).

203.    As administrator of EYLEA 4U, the Lash Group was also responsible for assisting patients in obtaining Medicare coverage, and appealing denials of Medicare coverage.

204.    Included in the August 2011 EYLEA 4U Presentation was a slide identifying CDF and PANF as the two PAPs that Regeneron would make quarterly payments to. From the outset, Regeneron mandated quarterly follow-ups "with the foundations to ensure donation is meeting the needs of EYLEA patients."

205.    Additionally, as administrator of EYLEA 4U, the Lash Group was responsible for referring and assisting physicians and patients in obtaining copay assistance from CDF and PANF. [**Exhibit 14**, Product Acquisition, EYLEA 4U and Marketing Resources].

206.    In fact, Defendants created an EYLEA 4U enrollment form that required physicians and patients to fully authorize EYLEA 4U to refer and obtain copayment assistance through CDF and PANF. [**Exhibit 14**, Product Acquisition, EYLEA 4U and Marketing Resources]

---

[21] In other words, during all relevant times herein, ABC was serving as (1) Regeneron's largest distributor (through Besse), (2) Regeneron's Reimbursement HUB (through the Lash Group); (3) Regeneron's consultant (through Xcenda), and (4) manager of PANF (through the Lash Group).

207.     As part of EYLEA 4U, Defendants provided physicians with a phone number for patients to call if they "need help managing their out of pocket co-pay expenses." [**Exhibit 14**, Product Acquisition, EYLEA 4U and Marketing Resources]

208.     In an email dated August 9, 2011, to Regeneron's executives, Cynthia Sherman, Regeneron's Senior Director of Reimbursement Services discussed payments to CDF and PANF based on discussions with those foundations. Sherman stated that she and another executive intended to "hold calls with both [CDF and PANF] at the end of each quarter to determine if the funding amount is on target for our patient population." Demonstrating knowledge of the OIG's Special Bulletins, Sherman stated, "[e]ven though *we cannot get a breakdown of our spend by EYLEA users*, they can let us know if we are supporting the bulk of *our* patients." [**Exhibit 15**, Sherman Email – August 9, 2011].

209.     On November 18, 2011, three days prior to Regeneron's commercial launch of Elyea, Regeneron entered into a "Donation Agreement" with CDF. [**Exhibit 16**, Donation Agreement].

210.     As acknowledged in the Donation Agreement, "applicable guidelines" prohibited Regeneron's receipt and use of data that would "facilitation [Regeneron] in correlating the amount or frequency of its Donations with the number of subsidized prescriptions for its products." In the Donation Agreement, in addition to its promises to the OIG, CDF promised it would not provide Regeneron reports "that include any information specific to a particular product or particular provider or supplier[.]" [*Id.*].

211.     CDF then added Elyea as the fourth AMD drug covered by CDF's AMD Fund.

212.     That year, Regeneron paid CDF $125,000.00. [**Exhibit 17,** Regeneron's Summary of Charitable Contributions by Year].

213.    Net product sales of Eylea in 2011 were $24.8 million.

214.    In March of 2012, Regeneron's executives were informed that a provider with a large number of Medicare Advantage patients raised concerns regarding whether the provider would be informed that its patients had been referred by EYLEA 4U to CDF. The provider advised that without some assurance that its patients were referred to CDF, "the EYLEA will not be deemed affordable" by the provider. In response, Robert Krukowski, Senior Manager of Regeneron's Reimbursement & Managed Markets Marketing, advised that its "foundation program" was 1.5 weeks out from going live, and that Regeneron would provide physicians with notice stating something along the lines of "Your patient is being referred to an independent non-profit organization for co-pay assistance." [**Exhibit 18**, Krukowski Email – March 2, 2012].

215.    In other words, physicians were instructed to route patients through EYLEA 4U (a Regeneron program managed by the Lash Group). EYLEA 4U would then refer Medicare beneficiaries to CDF, where the physicians would then be informed that the patients would receive copay coverage through CDF. There is substantial evidence that without such assurances, physicians would not have administered Eylea to patients, and would have instead opted for Aventis. [**Exhibit 18**, Krukowski Email – March 2, 2012; **Exhibit 19**, Casey Email – March 7, 2012 – explaining that beneficiaries that do not receive funding from CDF are "going to have to stay with less expensive therapy. We may see providers needing to stay with Avastin…"; **Exhibit 20**, Klein-Lewis Email – March 14, 2012 – "The offices need better support with the foundations. They need to be alerted when the patient has been approved for funding from the foundations…The patients in my area need help with their portions of the cost of Eylea so lack of funding equates to no Eylea. Patients are waiting for funding and continue on Avastin as their out of pocket is low."; **Exhibit 21**, Settlemyer Email – April 12, 2012 – explaining, "this year the foundations are already

out of money. [Patients] move to Avastin when this happens."; **Exhibit 22**, Deane Email – June 14, 2012 – explaining that lack of CDF funding "may not delay treatment completely because we will continue to use Avastin or other medication. We will NOT administer Eylea without the ID # from the foundations for copay assistance. If they do not need the copay assistance we will go ahead with treatment with Eylea."; **Exhibit 23**, Sympreux Email – September 4, 2012 – "Doctor advised due to the administrative burden to his staff and outstanding issue with patient's cost-sharing not being covered and a loss of revenue to the practice. He is switching up to 20 patients back to Avastin."; **Exhibit 24**, Orkin Email – December 13, 2012 – discussing a provider that previously prescribed Avastin to "99%" of Wet AMD patients and informing Regeneron that without EYLEA 4U facilitating receipt of copay assistance from CDF, "the doctors have stopped all new Eylea patients as well as all Avastin switches."; **Exhibit 25**, Mukand Email – January 9, 2014 – "Just got a call from [a provider] stating that CDF told them they have NO money. Therefore, right now, [the provider] is putting patients only on Avastin."; **Exhibit 26**, Allison Email – February 3, 2014 – "[Provider] shared several examples of instances where they did NOT receive the needed BI's and/or Co-Pay assistance for their patients PRIOR to injection dates as requested. As a result, patients came in for appointments and could not be given EYLEA & had to be switched to a lower cost alternative."].

216.    In fact, as explained by Wendi Stapleton, during her employment with the Lash Group, the Lash Group was provided full access to CDF's "Hub Portal", allowing the Lash Group to routinely obtain Eylea-specific data regarding individual beneficiaries funneled through CDF's AMD Fund. [**Exhibit 27**, Declaration of Wendi Stapleton].

217.    In relation to whether Defendants' scheme unduly influenced patient and physicians' decision-making, Stapleton explained,

During my time as Senior Manager and Director of Operations for EYLEA4U, I observed that if Lash either was unable to confirm that a patient's co-pay would be covered prior to a scheduled injection of Eylea, or had been unable to confirm the patients' benefits for the upcoming year, some physicians would either not provide treatment, or instead, administer Avastin, a significantly less-expensive alternate therapy. I understood this to be the case because these physicians did not want to absorb the cost of the drug. Because some of Lash's communications with physicians also included members of Regeneron's reimbursement team, I understood that Regeneron was aware that some physicians would not administer Eylea to a patient unless they were satisfied that the patient had coverage.

[*Id.*; *see also* **Exhibit 28**, Declaration of Nicole Siegel, M.D.; **Exhibit 29**, Declaration of Manju Sabramanian, M.D.; **Exhibit 30**, Regeneron's Draft Declaration for Dr. Ramin Sarrafizadeh – see Dr. Sarrafizadeh's revisions, including his deletion of the following sentence: "*The available of co-pay assistance has never induced me to prescribe EYLEA over any other treatments for wet AMD.*"].

218.    In a declaration *provided by Regeneron* in an ongoing case against the DOJ relating to Regeneron's relationship with CDF, Dr. Sarrafizadeh stated, "Cost is a consideration for me when recommending treatment. I will not administer Eylea unless the patient's insurance will cover it or the patient receives assistance or wants to pay out of pocket. Copay assistance or full payment assistance is usually available for my patients. *My understanding is that assistance comes from Regeneron.*" [**Exhibit 31**, Declaration of Dr. Sarrafizadeh].

219.    Dr. Sarrafizadeh further explained, "I typically have freedom of choice when prescribing wet AMD drugs because I know the patients will be able to afford the drugs once they receive insurance coverage or copay assistance. However, if assistance with drug coverage were not available and the patient could not afford Eylea, it would limit my treatment options for that patient to Avastin." [*Id.*]. Similar attestations have been provided by other providers. [*See, e.g.,* **Exhibit 28**, Declaration of Dr. Siegel – "I will not administer the medication unless the patient's insurance will cover it and/or the patient can afford the high costs of the medication. . . . If the co-

pay is high, my office will work with the patient to obtain copay assistance."; **Exhibit 32**, Declaration of Dr. Daniel Miller – "When I tell a Medicare patient with no supplemental insurance how much their balance for Eylea will be, most patients respond that they cannot afford it. For those who say they cannot afford the out-of-pocket costs for Eylea, there are two choices: go on Avastin or apply for assistance from a copay assistance foundation."; **Exhibit 33**, Ellen Adams Deposition Excerpts – estimating that 80% of patients at her practice start on Avastin]

**2012**

220.    In or around April of 2012, Regeneron approved payment of $300,000.00 to CDF. [**Exhibit 34**, Krukowski Email – April 6, 2012].

221.    It wasn't long before Regeneron and CDF began engaging in a course of conduct prohibited by the federal rules and regulations governing PAPs, including the OIG's Special Bulletins and Advisory Opinions.

222.    For instance, as expressly certified and promised by CDF in order to obtain a favorable Advisory Opinion from the OIG, CDF agreed that (1) it would not allow any "manufacturer or donor" to exert "any direct or indirect influence or control over" it; (2) it would award assistance "in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;" (3) it would award assistance "regardless of the drug manufacturer's interests, or the beneficiary's chose of product, provider, practitioner, supplier, or Part D drug plan; and (4) it would provide assistance "based on a  on a reasonably verifiable, *and uniform measure* of financial need applied *in a consistent manner*[.]"

223.    As of 2012, CDF had a 60-day policy for beneficiaries to apply for and seek copayment assistance. Often times, providers would contact Regeneron and the Lash Group (through EYLEA 4U) because CDF had informed the providers that the Elyea-specific beneficiary had failed to apply for copay assistance within 60-days of treatment. Upon receiving those provider

calls, Regeneron and the Lash Group would contact CDF's Executive Director, identify the particular beneficiaries that were denied copayment assistance, and request exceptions be made and assistance backdated. CDF routinely complied. [**Exhibit 35,** Stowe Email – July 10, 2012; **Exhibit 36**, Perry Email – July 19, 2012; **Exhibit 37**, Daniels Email – July 23, 2012; **Exhibit 38**, Daniels Email – May 13, 2013; **Exhibit 39**, Robert Krukowski Deposition Excerpts].



224.    EYLEA4U materials distributed by the Lash Group to physicians and patients misrepresented CDF as "an independent co-pay assistance foundation."

225.    EYLEA4U materials falsely claims on websites and in promotional materials that "Regeneron does not influence or control the operations of patient assistance programs through independent charitable foundations."

226.    On July 9, 2012, Regeneron's Krukowski emailed William Daniels, Senior Manager of Regeneron's Reimbursement Access Programs, regarding increasing funding to CDF.

Krukowski stated, "[w]e probably should up our overall contribution to CDF *given our performance* but *it is going to be hard to just pick a number.*" [**Exhibit 40**, Krukowski Email – July 9, 2012].

227.    On July 23, 2012, Daniels emailed Corinda Walley, CDF's Executive Director, requesting a meeting to discuss Regeneron's "budget planning for 2013." Daniels stated, "I am going to need to justify my request for our 2013 donation." A meeting was scheduled for 4:00 p.m. [**Exhibit 41**, Daniels Email – July 24, 2012].

228.    At 3:33 p.m., Walley sent Daniels a document titled "Regeneron Projections 2013". In it, Walley provided Daniels a breakdown of the amount needed for "New Patients" in 2013, and the amount needed for "Rollover Patients" in 2013. Walley provided a quarterly breakdown of the expected "New Patients" in 2013. Walley requested more than $44 million from Regeneron to account for the "Total Projected Funding Needed". [**Exhibit 42**, Daniels Email – July 24, 2012]. Daniels forwarded Walley's projections to Krukowski and stated, "[Walley] is stating that her 2013 projection is pretty much *our 2012 actuals.*" [*Id*]. As later testified by Daniels, Daniels understood Walley's projections to refer to Eylea-specific beneficiaries, contrary to the promises CDF made to the OIG. [**Exhibit 43**, Daniels Deposition Transcript; *see also,* **Exhibit 44**, Declaration of Charles Moorman; **Exhibit 45**, Dennis Regan Expert Rebuttal Report].

229.    Tellingly, just several months earlier, Walley had provided Genentech with its 2013 projections. Although both Regeneron and Genentech provided funding to the same AMD Fund, and although CDF specifically promised the OIG that it would not provide patient-specific data to drug manufacturers, CDF provided Genentech with Lucentis-specific data as reflected by the fact that the report to Genentech contained different projections than the report provided to Regeneron. For example, while Walley's report to Regeneron projected $44 million of "Funding Needed" for

the AMD Fund, Wally's report to Genentech projected $119.4 million of "Funding Needed" for the AMD Fund. [*Compare* **Exhibit 46**, CDF's January 25, 2013, Projections to Genentech, *with* **Exhibit 47**, CDF's January 25, 2013, Projections to Regeneron].

230.   On August 8, 2012, Daniels provided Regeneron management with updated projections "based on conversations [he] had with [Walley.]" Daniels stated that the population of beneficiaries seeking funding from CDF's AMD Fund was 20,000, and of that, 2,800 beneficiaries sought copay assistance for Eylea. [**Exhibit 48**, Casey Email, August 15, 2012].

231.   On August 14, 2012, Daniels sent a follow up email. He explained that Regeneron "started tracking our copay referrals shortly after we rolled out the new program. We are averaging 316 referrals *a week.*" Accordingly, Daniels requested approval for $5.6 million to cover the "Rollover Patients" approved by CDF to obtain copay assistance *for Eylea.* Daniels warned that the AMD Fund "may shut down next year" if Regeneron did not provide funding for Eylea-specific beneficiaries. [**Exhibit 48**, Casey Email, August 15, 2012].

232.   On August 15, 2012, Daniels provided Regeneron management with a document titled "Regeneron CDF Funding Discussion." In the document, Daniels informed management of CDF's requirement that Regeneron provide funding for "their market share [of] the fund[.]" Daniels informed management that they would lose a substantial amount of Elyea sales if CDF is not provided at least $17.1 million from Regeneron. [**Exhibit 49**, Daniels Email – August 16, 2012; *see also,* **Exhibit 50**, Walley Email – August 16, 2012].

233.   On August 16, 2012, Daniels informed Krukowski that without CDF's requested funding, Regeneron would experience "potential lost sales" of "30% of patients." [**Exhibit 51**, Krukowski Email, August 16, 2012].

234.   On August 16, 2012, Daniels emailed Lash Group management requesting "a

breakout of copay referrals" to CDF for the month of July. The following day, the Lash Group informed Daniels that the Lash Group had referred 1,304 patients to CDF in the month of July. The Lash Group also provided Daniels with patient-specific information relating to each beneficiary referred to CDF in July. [**Exhibit 52**, The Lash Group Report].

235.    On August 20, 2012, Regeneron's executives met to discuss funding to CDF. The meeting invitation informed participants that the meeting was set to "gain consensus on our foundation funding strategy (*ROI,* risks, considerations) for 2013 for AMD…" [**Exhibit 53**, August 20, 2012, Meeting Invite].

236.    On August 27, 2012, Daniels provided Regeneron management with a PowerPoint presentation containing updated projections for 2013. In it, Daniels reiterated that CDF required Regeneron to provide funding to account for its "market share" or else "the fund will be closed[.]" The PowerPoint stated that the "CDF quoted Regeneron Share of AMD Fund" was approximately 6,200, with an expected 9,500 new patients in 2013. Utilizing patient-specific information provided by CDF, as well as the patient-specific data provided by the Lash Group, Daniels requested that Regeneron pay CDF an additional $17.2 million for 2013. Daniels warned that failure to provide the amount requested would result in "Potential Lost Revenue" of $10.9 million in Eylea sales.  [**Exhibit 54**, Daniels Email – August 27, 2012; *see also,* **Exhibit 43,** Daniels Deposition Transcript – explaining that he used data patient-specific data obtained by the Lash Group, along with the Eylea-specific data provided by CDF to conduct ROI calculations].

237.    On October 4, 2012, utilizing the patient-specific information he obtained from CDF and the Lash Group, Daniels provided Regeneron management with a ROI analysis for Regeneron's 2013 funding to CDF. Daniels also informed Regeneron management that "CDF management has communicated that for 2013, if every donor doesn't cover their market share the

fund will be closed, potential impact: Patients not starting and/or stopping therapy due to inability to afford out of pocket costs[;] Providers upset as program has never been closed due to lack of funding." [**Exhibit 55**, Daniels Email – October 4, 2012].

238.     As of December 2012, Robert Terifay, Regeneron's Executive Vice President, estimated that approximately 80% of patients seeking treatment for Wet AMD were Medicare beneficiaries. [**Exhibit 56**, Terifay Email – December 3, 2012].

239.     On December 4, 2012, Daniels provided Regeneron's management with copies of the OIG Advisory Opinions. [**Exhibit 57**, Daniels Email – December 5, 2012].

240.     On December 19, 2012, Krukowski sent an email regarding Regeneron's approved payment of an additional $2.5 million to CDF. Krukowski stated that, based on information obtained from CDF, CDF is processing "re-enrollment" for 6,800 Eylea-specific beneficiaries. Krukowski stated that CDF had "provided us more information on [Genentech's] funding", and that CDF advised that the $2.5 million would not be sufficient to cover the Eylea-specific beneficiaries in Q1 of 2013. Krukowski stated that CDF threatened to stop providing copay assistance to Eylea beneficiaries if Regeneron did not provide sufficient funding to account for those beneficiaries. [**Exhibit 58**, Casey Email – December 19, 2012; *see also*, **Exhibit 59**, Walley Email – December 19, 2012; **Exhibit 60**, Daniels Email – December 20, 2012].

241.     For 2012, Regeneron paid CDF $600,000.00. [**Exhibit 17].**

242.     According to Regeneron's 2012 10-K, sales for Eylea increased from $24.8 million in 2012, to $837.9 million in 2013. Besse (an ABC company) accounted for 78% of Regeneron's Elyea sales. Regeneron also reiterated the following concern,

> Since EYLEA is too expensive for most patients to afford without health insurance coverage, if adequate coverage and reimbursement by third-party payers, including Medicare and Medicaid in the United States, is not available, our ability to successfully commercialize EYLEA will be materially adversely impacted.

243.    On January 3, 2013, a meeting was held by Regeneron's management to discuss Regeneron's "CDF funding strategy." The meeting invite indicated that Daniels had obtained "new information" from CDF regarding "other Donors commitments and our current roll over patients" in CDF's AMD Fund. [**Exhibit 61**, January 3, 2013, Meeting Invite].

244.    Following the meeting, Krukowski emailed Walley stating, based on Walley's Eylea-specific projections for 2013, "the additional $2.5 mil we were planning on funding in Q1 was not enough based up[on] the current number of EYLEA patients CDF has already rolled over and enrolled for 2013." Krukowski informed Walley that, according to her Eylea-specific projections, Terifay was made aware "that we potentially need ~$25Mil to adequately fund *our patient responsibility* for 2013." [**Exhibit 62**, Krukowski Email – January 3, 2013].

245.    Shortly thereafter, Regeneron approved payment of $25 million to CDF, with $8 million provided immediately. [**Exhibit 63**, Fenimore Email – January 4, 2013; **Exhibit 64**, Daniels Email – January 4, 2013].

246.    On January 23, 2013, a provider from the Department of Ophthalmology at Mount Sinai School of Medicine expressed his frustration to Regeneron for the lack of copayment funding provided for the beneficiaries he prescribed Eylea. In relevant part, the provider stated, "I was very clear to your company. If I am not going to be paid the 80% + 20% *guaranteed in ALL circumstances when my office is doing exactly what your company has instructed us to do* I will not continue to incur a possible loss from the use of EYELEA [sic]." [**Exhibit 65**, Mahoney Email – January 25, 2013] (italics and underline added).

247.    The following day, Daniels sent Walley an email seeking the amount needed from Regeneron to cover the co-payments for Eylea-specific beneficiaries. Walley responded, providing a breakdown by quarter for 2013, and seeking a total of $15.5 million in funding to cover Eylea-

specific beneficiaries in Q1. [**Exhibit 47**, CDF's January 25, 2013 Projections to Genentech; **Exhibit 66**, Daniels Email – January 31, 2013; **Exhibit 67**, Daniels Email – February 6, 2013].

248.    That same day, on January 25, 2013, CDF provided Genentech with projections for 2013. Although both Regeneron and Genentech provided funding to the same AMD Fund, and although CDF specifically promised the OIG that it would not provide patient-specific data to drug manufacturers, CDF provided Genentech with Lucentis-specific data as reflected by the fact that the report to Genentech contained different projections than the report provided to Regeneron, that same day. Those differences included multiple categories in the calculations, including i) the number of "Rollover Patients"; (ii) the average grant amounts per patient ("Projected Funding Per Patient"), (iii) the "Cancellation Rate"; (iv) the "Growth Rate Over Previous Year"; and (v) the direct-to-patient assistance amount ("CDF DPTA"). [**Exhibit 46**, CDF's January 25, 2013, Projections to Genentech].

249.    As admitted in testimony later provided by Walley, CDF's projections to Regeneron and Genentech were tailored to each manufacturer based on the specific drug used by beneficiaries in the AMD Fund. [**Exhibit 68**, Walley Deposition Excerpts].

250.    Indeed, a subsequent interview conducted by the DOJ of Regeneron's former Chief Financial Officer, Murray Goldberg, Goldberg admitted that Regeneron's payments to CDF were made with the intent to only be used for Eylea-specific patients. When the DOJ asked, "What about Lucentis patients?", Goldberg replied, "That's Genentech's problem." [**Exhibit 69**, Agent Sawyer Deposition Excerpts].

251.    In February 2013, Regeneron's management was provided a research report provided by Vision Critical based on "physician tracking" and "current wet AMD market dynamics." Significantly, Regeneron was informed that approximately 40% of patients decline to

take Eylea due to inability to afford their cost-sharing requirements. Regeneron was also informed that approximately 16% of patients permanently discontinued anti-VEGF treatment do to out-of-pocket costs. [**Exhibit 70**, Physician ATU: Wave 2 Presentation – also explaining that "[w]hile MDs say that most attributes are important, *cost is truly the overarching determinant of wet AMD treatment selection (where AVASTIN holds a significant advantage*."].

252.    On February 20, 2013, Thibalt Corbin de Mangoux, the Internal Audit manager at Regeneron, requested information regarding Regeneron's relationship with CDF. Mangoux requested details regarding how Regeneron determined the amount of funding it would provide CDF, and specifically inquired into whether CDF provided Regeneron with Eylea-specific data. Daniels forwarded the request to Regeneron's executives stating, "I am not really comfortable **providing** the documentation he is requesting." Robert Davis, the Executive Director of Regeneron's Trade, Reimbursement & Managed Markets Division, agreed. Terifay responded, "I will handle." [**Exhibit 71**, Terifay Email – February 22, 2013].

253.    On February 23, 2013, Terifay forwarded Daniels email to John Calabro, Regeneron's VP of Internal Audit. Significantly, Terifay changed Daniels email from "I am not really comfortable **providing** the documentation he is requesting" to say, "I am not really comfortable **asking for** the documentation he is requesting. [**Exhibit 72**, Terifay Email – February 25, 2013].

254.    Demonstrating his knowledge of the unlawful data-sharing provided by CDF to Regeneron, and in further effort to conceal the Co-Pay Scheme, Terifay told Calabro the following,

> Pharmaceutical companies cannot provide reimbursement assistance of any kind to patients covered in any way by a government insurance program. We can provide donations to independent Foundations for specific disease states, such as Wet Age-related Macular Degeneration that provide assistance to patients under their own criteria uninfluenced by donors. Donors have no rights to information of any sort on disposition of funds.

Based upon our profitable growth in 2012, we were able to increase our grant in 2013 to the Chronic Disease Fund's wet AMD fund. We cannot ask for any information from the CDF. We gave a charitable donation.

[*Id.*].

255.    Calabro responded,

As you know we are performing a review of our patient assistance program which is mainly focused on the LASH group. We became aware of the foundation program and are just trying to get an understanding of how it works which would include how the funding amount was determined and whether they would provide any reporting to us on the program; perhaps as a basis for additional contributions. If we do not receive anything form [sic] them that is fine. I think Bill may have misunderstood as we were not asking him to ask the foundation for information, but rather we were asking if we already were receiving any information.

[*Id.*].

256.    That same day, Terifay responded, "We do not have any documentation given that this is an independent donation." [*Id.*].

257.    On April 5, 2013, Walley sent Daniels "updated" Eylea-specific projections of $25.5 million "Funding Needed". [**Exhibit 73**, Daniels Email – April 5, 2013].

258.    On June 18, 2013, Walley sent Daniels "updated" Eylea-specific projections of $34.5 million "Funding Needed". [*Id.*].

259.    On June 24, 2013, Daniels provided Krukowski with a PowerPoint titled "EYLEA4U CDF Donations". In it, Daniels utilized the Eylea-specific data provided by Walley to conduct ROI calculations of the funding provided by Regeneron. Based on the information obtained by Walley, Daniels advised that Eylea-specific beneficiaries comprised of approximately 41% of the AMD Fund and is projected to obtain a 50% share of the AMD Fund by January 2014. Daniels projected that the AMD Fund would be comprised of 50,385 beneficiaries as of December 31, 2013.

260.    Daniels calculated a "Potential ROI" of 465%, or $198.5 million in sales of Eylea

as a result of Regeneron's payments to CDF. [**Exhibit 74**, Daniels Email – June 24, 2013; **Exhibit 75**, Fenimore Email – June 26, 2013; *see also,* **Exhibit 39**, Krukowski Deposition Transcript – admitting to conducting ROI calculations].



261.    Based on the information Daniels relayed to Regeneron's management, Regeneron approved $17.5 million in funding to CDF in Q3 of 2013, with an additional $5 million in Q4. [**Exhibit 76**, Daniels Email – June 27, 2013; **Exhibit 77**, Fenimore Email – July 9, 2013].

262.    On July 10, 2013, Walley provided Daniels with Eylea-specific projections for 2014. Walley projected "Funding Needed" from Regeneron in amount of $55.3 million for Eylea-specific beneficiaries. [**Exhibit 78**, Walley Email – July 10, 2013].

263.    On September 24, 2013, Regeneron informed Eylea that it would "provide the remaining 5MM in Q3", as opposed to Q4. [**Exhibit 79**, Daniels Email – September 24, 2013; *See*

*also,* **Exhibit 80**, Dressel Email – September 24, 2013; **Exhibit 81**, Daniels Email – September 23, 2013; **Exhibit 82**, Daniels Email – September 24, 2013; **Exhibit 83**, Dressel Email – September 30, 2013].

264.   On September 25, 2013, Walley provided Daniels with "the 2014 *needs* projection for the AMD program." Walley projected $54.8 million in "Funding Needed" for Eylea-specific beneficiaries in 2014. [**Exhibit 84**, Walley Email – September 25, 2013; *see also,* **Exhibit 85**, Capobianco Email – November 4, 2013].

265.   On November 25, 2013, following negative media reports about the nature of CDF's relationship with Questcor, Calabro, Regeneron's Executive Director of Internal Audit, again seeking information relating to Regeneron's relationship with CDF. Calabro sought examples of the reports provided by Walley to Daniels, and confirmation that Daniels "has not had any conversations with CDF concerning product level data." [**Exhibit 86**, Krukowski Email – November 25, 2013].

266.   That same day, Daniels sent an email to Walley requesting "a copy of the monthly CDF activity report." [**Exhibit 87**, Daniels Email – November 25, 2013].

267.   Walley responded with "the AMD Program aggregate report." Daniels forwarded that report, only, to Calabro. [**Exhibit 88**, Daniels Email – December 3, 2013].

268.   On December 4, 2013, Calabro responded asking if (1) "Do you receive any other reports or data in emails from CDF? If so, please provide"; and (2) "How does CDF make a request for additional funding? Is it verbal or by email? How do they justify it? Please provide any documentation you might have regarding such requests." [**Exhibit 89**, Davis Email – December 4, 2013].

269.   Robert Davis, Regeneron's Executive Director & Head of Trade, forwarded

Calabro's questions to Terifay, with a subject line reading "HOW SHOULD [WE] ANSWER SECOND QUESTION FROM [CALABRO]." In response, Terifay posited: "Isn't the answer that she estimates what she needs for the year verbally and then we divide across the year when we can afford it." Terifay knew this "answer" was false. [**Exhibit 89**, Davis Email – December 4, 2013]

270.    On December 5, 2013, Krukowski followed up with Daniels, stating, "Bil, you received the answer from Bob [Terifay] yesterday so please make sure you respond to John [Calabro] tonight." [**Exhibit 90**, Krukowski Email – December 5, 2013].

271.    On December 5, 2013, Daniels followed this instruction, telling Calabro, "No I don't receive any other reports or data. My contact estimates what she needs for the year verbally and then we divide across the year when we can afford it. If she is running low, she calls and indicates what more she needs." Daniels later testified that he knew this to be a lie. [**Exhibit 91**, Davis Email – December 6, 2013; **Exhibit 43,** Daniels Deposition Transcript].

272.    On December 6, 2013, Calabro followed up, asking, "When [Walley] makes a request for funding, how does she justify it? Can you send me an example email?" [**Exhibit 92**, Daniels Email – December 6, 2013].

273.    Daniels internally proposed responding that Walley "does provide a projection of the # of patients and the[] correlating dollars." [*Id.*]

274.    Instead, Davis replied stating, "It is all verbal." [**Exhibit 91**, Davis Email – December 6, 2013].

275.    For that year, Regeneron had paid CDF a total of $35 million. As with most, if not all payments made by Regeneron to CDF, CDF pocketed 9% of that in fees.

276.    For that year, CDF had provided $25.3 million in copayment assistance to Eylea-specific beneficiaries.

66

277.    According to an expert report prepared on behalf of the DOJ, for 2013, 108,183 claims for Eylea were paid by Medicare Part B as a result of Defendants' illegal use of CDF, and 74,390 claims for Eylea were paid by Medicare Part C plans. In total, the DOJ estimated that 182,573 claims for Eylea were paid by Medicare *and* were a result of Defendants' unlawful use of CDF. [**Exhibit 93**, Ian Dew Report].

278.    In its 2013 10-K SEC Report, Regeneron reported that it generated $1.4 billion in Eylea sales for 2013– up from $837.9 million the prior year. Regeneron reported that 76% of those sales were made through Besse, "a subsidiary of AmerisourceBergen Corporation", to providers.

279.    Significantly, in its 2013 10-K Report, Regeneron stated the following,

Selling, general, and administrative expenses increased to $329.4 million in 2013 from $210.8 million in 2012 *primarily due to* higher expenses in connection with commercialization of EYLEA, including…*contributions to a not-for-profit organization* that assists patients with chronic disease conditions…

280.    According to deposition testimony of Murray Goldberg, Regeneron's former Chief Financial Officer, the reference to the "not-for-profit organization" referred to CDF. [**Exhibit 94**, Murray Goldberg Deposition Excerpts].

**<u>2014</u>**

281.    On January 3, 2014, evidently undeterred by the questions and lies provided to Calabro in December of 2013, Walley sent Daniels "2014 Updated Projections". Walley projected $39 million "Funding Needed" from Regeneron for Eylea-specific beneficiaries in 2014. [**Exhibit 95**, Walley Email – January 3, 2014; *see also,* **Exhibit 96**, Daniels Email – January 3, 2014].

282.    On January 4, 2014, Walley provided another "2014 Updated Projections", identifying the "Funding Needed" from Regeneron for Eylea-specific beneficiaries. [**Exhibit 97**, Daniels Email – January 4, 2014; *see also,* **Exhibit 98**, Davis Email – January 4, 2014; **Exhibit 99**, Daniels Email – January 6, 2014; **Exhibit 100**, Davis Email – January 10, 2014].

283.    From January 15, 2014, to June 4, 2014, Regeneron paid CDF $27.8 million for Eylea-specific beneficiaries. CDF's management admittedly took 9% of that for themselves.

284.    In May 2014, the OIG notified CDF and PANF that it had concerns that certain 501(c)(3) organizations were serving as conduits for drug manufacturers to subsidize their own drugs. [*See, e.g.,* **Exhibit 101,** OIG Notice to PANF].

285.    CDF and PANF falsely recertified that they operate in compliance with the Five Requirements and falsely promised that they would continue to comply with the Five Requirements. [**Exhibit 102,** CDF Modified Advisory Opinion; **Exhibit 103,** PANF Modified Advisory Opinion].

286.    In 2014, CDF provided $33.1 million in copay assistance for Elyea-specific beneficiaries.

287.    For 2013 and 2014, Regeneron paid CDF $35 million and $22.7 million, respectively, and the AMD Fund provided $25.3 million and $33.1 million respectively. Therefore, for 2013 and 2014, the difference between Regeneron's contributions and CDF's assistance to Eylea patients from the AMD Fund was only $655,000, or 1% of Regeneron's contributions.

288.    In its 2014 10-K Report, Regeneron reported "Net product sales of EYLEA in the United States were $1,736.4 million in 2014, $1,408.7 million in 2013, and $837.9 million in 2012." Of that, 73% were through Besse.

289.    Again, mispresenting the nature of its payments to CDF, further concealing the Co-Pay Scheme, Regeneron reported an increase in "[s]elling, general, and administrative expenses" of $329.4 million "primarily due to higher expenses in connection with commercialization of EYLEA, including…*contributions to a not-for-profit organization*…"

**2015**

290.    In 2015, Regeneron paid CDF $17.5 million.

291.    Significantly, Regeneron also paid PANF $20 million to provide copayment assistance to Eylea-specific beneficiaries. [**Exhibit 17**].

292.    At all relevant times herein, PANF was operated and managed by the Lash Group – the same Defendant that operated Regeneron's HUB, and affiliated company of Regeneron's distributor (Defendant Besse).

293.    In fact, pursuant to public filings, significant portions of manufacture contributions to PANF were funneled directly to the Lash Group for its operation of PANF.

294.    For example, from 2012 to 2015, Lash Group net revenues included $43.8 million of contributions made by manufacturers to PANF. [**Exhibit 5** – $6.7 million paid in 2012 for the Lash Groups management of PANF's "assistance" services; $10.1 million paid in 2013 for "Patient Mgmt Services[.]";$11.3 million paid in 2014 for "Patient Services[.]"; $15.7 million paid to the "Lash Group Amerisource Bergen Consulting SE" in 2015 as manager of its "Patient Services[.]"].

295.    Recall, at all relevant times herein, the Lash Group served as the administrator of EYLEA 4U (Regeneron's "HUB"). As administrator of EYLEA 4U, the Lash Group was responsible for, among other things, (1) routing beneficiaries through CDF *and* PANF; and (2) coordinating with Besse (also an ABC-affiliated company and largest distributor of Eylea) to ensure beneficiaries received copayment coverage for Eylea. (**Exhibit 13**, Trade & Distribution Presentation).

296.    Accordingly, Regeneron's contributions to PANF, the Lash Group's referral of beneficiaries to PANF, and PANF's reported payments to the Lash Group for "management" of PANF's patient assistance services, demonstrates that Regeneron maintained significant influence and control over PANF's operations, as prohibited by the federal rules and regulations governing such PAPs.

297.    For that year, net product sales of Eylea increased almost $1 billion for the prior year, to $2.7 billion. 67% of those sales related to distribution by Besse to providers.

298.    In its 2015 10-K Report, Regeneron stated,

EYLEA net sales represent a substantial portion of our revenues and this concentration of our net sales in a single product makes us substantially dependent on that product. For the years ended December 31, 2015 and 2014, EYLEA net sales in the United States represented 65% and 62% of our total revenues, respectively. If we were to experience difficulty with the commercialization of EYLEA in the United States…we may experience a reduction in revenue and may not be able to sustain profitability, and our business, prospects, operating results, and financial condition would be materially harmed.

299.    In October 2015, the OIG issued a Modified Advisory Opinion, stating PANF had, through the mail and wire, re-certified compliance with OIG regulations and AKS, and provided additional certifications concerning the legitimacy of their operations, most of which later proved to be false. [**Exhibit 102; Exhibit 103**].

**2016**

300.    In 2016, Regeneron paid CDF $83.1 million and PANF $48.4 million.

301.    That year, PANF paid $20.6 million to the "Lash Group Amerisource Bergen Consulting" as manager of its "Patient Services."

302.    According to an internal Regeneron email, as of November 2, 2016, PANF was no longer providing co-pay assistance to Eylea-specific beneficiaries. However, CDF was. [**Exhibit 104**, Mahoney Email – November 2, 2016].

303.    For that year, net product sales of Eylea increased to $3.3 billion. 55% of those sales related to distribution by Besse to providers.

304.    In its 2016 10-K Report, Regeneron reported an increase in expenses "primarily due to… higher contributions to not-for-profit organizations, including donations to independent not-for-profit patient assistance organizations…"

**2017**

305.    In January 2017, Regeneron received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents relating to its relationship with CDF.

306.    That year, Regeneron paid CDF an additional $36 million for Eylea-specific beneficiaries. [**Exhibit 17**; *see also,* **Exhibit 105**, Pygon Email – January 5, 2017].

307.    That year, the "Lash Group Amerisource Bergen Consulting" was paid $14 million for its operation of PANF's "Patient Services."

308.    Net product sales of Eylea increased in 2017 to $3.7 billion, 51% relating to sales made by Besse to providers.

**2018—2023**

309.    According to its 10-K filings, Regeneron continued to increase its "contributions to *independent not-for-profit* patient assistance organizations", in 2018, 2019, and 2020. Net product sales of Eylea were $4.1 billion, $4.4 billion, and $5 billion, respectively. Besse accounted for 56%, 57%, and 51%, of those sales, respectively.

310.    In March of 2019, Regeneron met with DOJ officials and presented a PowerPoint presentation full of lies. In at least 6 separate slides, Regeneron represented that CDF did not provide patient-specific data and that it "kn[e]w for a fact that CDF did not provide actual EYLEA patient numbers." [**Exhibit 106**, March 2019 Presentation to the DOJ].

311.    In September of 2019, Regeneron told DOJ officials that it was certain Walley would confirm that CDF did not provide Eylea-specific data. Regeneron also presented another PowerPoint presentation denying any wrongdoing and compounding its lies. [**Exhibit 107,** September 2019 Presentation to the DOJ].

312.    That same month, Regeneron received a civil investigative demand ("CID") from the DOJ pursuant to the federal False Claims Act relating to remuneration paid to physicians in

the form of consulting fees, advisory boards, speaker fees, and payment or reimbursement for travel and entertainment allegedly in violation of the federal Anti-Kickback Statute. The CID related to Regeneron's sale of Eylea from January 2015 to 2019.

313.    In October of 2019, the DOJ announced a settlement with CDF and PANF regarding their conduct *with other drug manufacturers.* CDF and PANF each agreed to pay the DOJ $2 million. [**Exhibit 108**, DOJ Press Release; **Exhibit 109**, CDF Settlement Agreement; **Exhibit 110**, PANF Settlement Agreement].

314.    That year, ABC reported a decrease in revenue of approximately $18.7 million, "primarily due to" a "decrease in revenue at ABCS's Lash consulting group."

315.    On June 24, 2020, as a result of the DOJ's findings regarding CDF's improper and illegal relationship with Regeneron, the U.S. Attorney's Office for the District of Massachusetts filed a civil complaint in the U.S. District Court for the District of Massachusetts alleging violations of the federal Anti-Kickback Statute and asserting causes of action under the federal False Claims Act and state law. [*See, United States of America v. Regeneron Pharmaceuticals, Inc.,* Case No. 20-11217, United States District Court District of Massachusetts].

316.    In June 2021, Regeneron received a CID from the DOJ concerning allegations that Regeneron (i) violated the False Claims Act by paying kickbacks to distributors (particularly Besse) and ophthalmology practices to induce purchase of Eylea, including through discounts, rebates, credit card fees, free units of Eylea, and inventory management systems; and (ii) inflated reimbursement rates for Eylea by excluding applicable discounts, rebates, and benefits from the average sales price reported to CMS. The CID covered the period from January 2011 through June 2021.

317.    In its 2022 and 2023 10-K Reports, Regeneron again announced "higher

contributions to an *independent not-for-profit patient assistance organization.*"

### The DOJ Qui Tam Action

318.    In June 2021, a *qui tam* complaint currently pending against Regeneron, ABC, and Besse, and relating Eylea sales, was unsealed. [*See, United States of American, et. al, v. Regeneron Pharmaceuticals, Inc., et. al,* Case No. 20-11401, United States District Court District of Massachusetts].

319.    The Complaint alleged additional ways in which Regeneron, ABC, and Besse attempted to influence physicians to prescribe and administer Eylea to Medicare beneficiaries.

320.    Particularly, from 2011 until at least 2022, Regeneron, ABC, and Besse, unlawfully funneled subsidies to induce prescriptions of Eylea.

321.    These subsidies included providing physicians with "free inventory" of Eylea, as well as free inventory systems (such as refrigerators and access to Besse's expensive, cloud-based inventory management system), so long as Eylea was obtained through Besse.

322.    On March 2024, the DOJ filed an Intervenor Complaint in the *qui tam* action currently pending against Regeneron, ABC, and Besse. [*See, United States of American, et. al, v. Regeneron Pharmaceuticals, Inc., et. al,* Case No. 20-11401, United States District Court District of Massachusetts, CM/ECF No. 58].

### Credit Card Subsidies for Eylea

323.    Under the distribution agreements between Regeneron and distributors, Besse and the other distributors were responsible for collecting payments from retina practices.

324.    Distributors then sold Eylea to retina practices.

325.    Regeneron paid distributors a service fee for each unit of Eylea they sold.

326.    Regeneron knew customers tracked their spreads on high-cost, buy-and-bill drugs like Eylea. Large retina practices often have non-medical staff, frequently called "practice

administrators," who are responsible for financial aspects of the practice, including tracking their practice's spreads for Eylea, Lucentis, and Avastin. Regeneron hired a number of these practice administrators as consultants and as speakers for Eylea reimbursement-focused dinner events with customers and potential customers.

327.    Regeneron knew these financial considerations were important to customers and even tracked them itself. For example, in a slide called "Q2 2016, Current Day, Practice Economics," from an internal 2016 presentation, Regeneron calculated "Cost Recovery per Vial" for Eylea, Avastin, and Lucentis, showing that customers had an $80 "Cost Recovery per Vial" for Eylea, not including any credit card rewards or cash back, compared to $20 for Avastin.

328.    Regeneron's internal records reveal that Regeneron knew that retina practices considered profits when determining which drugs to prescribe.

329.    Additionally, Regeneron knew that distributors incurred processing fees if retina practices used credit cards to purchase expensive drugs like Eylea, and that distributors would charge retina practices a higher amount to use credit cards for Eylea purchases, unless Regeneron paid those fees.

330.    Regeneron also knew that physicians purchasing Eylea would incur an average credit card fee of 2.35%, and that approximately 85% of Eylea purchases were made with credit cards.

331.    Accordingly, Regeneron agreed to pay distributors a separate amount for credit card processing fees so the distributors would not charge retina practices more to use credit cards to purchase Eylea ("Credit Card Subsidies").

332.    According to Regeneron's 2011 distribution agreement with Besse, Besse agreed to accept credit card purchases from retina practices for Eylea purchases. Besse would then "pass

through all processing charges incurred by [Besse] from credit card sales to Regeneron on a monthly basis", which would then be paid by Regeneron.

333.    As of 2011, similar Credit Card Subsidies were also available to retina practices that received Eylea from one of the other two distributors: CuraScript & McKesson.

334.    Because of the high cost of Eylea, this cash back often amounted to hundreds of thousands of dollars per practice per year. One Massachusetts ophthalmic practice tracked its "AMEX Cash Back Earned [] on Amount Paid to Besse" for Eylea purchases on a quarterly basis. Its total cash back on Eylea purchases in 2019 was $445,044.39.

335.    "Buy-and-bill" drugs like Eylea and Lucentis often face downward pricing pressure when competing products enter the market, as manufacturers offer price concessions to increase customers' spreads on their respective products.

336.    Regeneron understood that it was legally obligated to report price concessions to CMS and that doing so would lower Eylea's ASP. A lower ASP meant that a manufacturer needed to offer more price concessions to offer the same spread. Indeed, as Regeneron was aware, Lucentis's ASP declined because Genentech offered and reported rebates for Lucentis

337.    Internal Regeneron records reveal that Regeneron provided Credit Card Subsidies to physicians from 2012 until present. Nevertheless, Regeneron concealed those subsidies by failing to report those subsidies as price concessions. This resulted in the ASP for Eylea remaining artificially inflated.

338.    Regeneron knew that its payment of credit card processing fees on behalf of customers was a price concession, and because Regeneron did not report them as price concessions, it further benefitted by not eroding Eylea's ASP.

339.    Regeneron paid credit card processing fees for customers' Eylea purchases on the

condition that Distributors did not charge Eylea customers more to use a credit card.

340.    Regeneron then paid distributors for the credit card processing fees for Eylea purchases.

341.    Internal records reveal that Regeneron provided Credit Card Subsidies so that Distributors would not charge physicians for credit card fees associated with Eylea purchases.

342.    Internal records reveal that Regeneron provided Credit Card Subsidies to gain an unfair advantage over alternative Eylea treatments. For example, Besse informed physicians that while "Eylea (Regeneron) can be paid by credit card" without incurring a "cash discount lost fee," Lucentis and Aventis "can NOT be paid by credit card without forfeiting the cash discount (which adds ~2.4% to the cost)."

343.    To facilitate the payment of Credit Card Subsidies, Besse provided Regeneron with monthly invoices itemizing the credit card fees on a purchase-by-purchase basis, including the customer, amount of Eylea purchased, and the credit card fee percentage. Besse also provided the actual credit card processing fee amounts incurred for each Eylea purchase. Besse's invoices identified the fees as "EYLEA CR CARD FEES" (or similar), and Regeneron specifically requested backup spreadsheets listing credit card fees on a per customer and per purchase basis— which Besse provided to Regeneron each month along with its invoices.

344.    At all relevant times, Regeneron received specific transactional data from Distributors that enabled Regeneron to track the amount of Credit Card Subsidies.

345.    In 2014, Regeneron paid physicians approximately $4.6 million in Credit Card Subsidies relating to sales of Eylea made through Besse.

346.    In or around July of 2015, Regeneron paid physicians more than $2.3 million in Credit Card Subsidies relating to sales of Eylea made through Besse.

347.     In or around March of 2018, Regeneron paid $2.4 million in Credit Card Subsidies relating to sales made through Besse.

348.     A 2021 draft approval memorandum identified "Projected Credit Card Fees" of $56.9 million for Besse alone:

> The Distributors pass through credit card processing fees incurred when physicians pay for EYLEA using a credit cards [sic]. Credit card fees average approximately 2.05% (per recent Finance review) and are expected to be applied to approximately 85% of all orders.
>
> • For 2021, we have adjusted credit card fees based on analysis completed by the corporate Finance teams on actual amounts charged and fees.
> . . .

| Additional Estimated Fees | Credit Card Fees (as of Q3 2020) | Projected Credit Card Fees |
|---|---|---|
| Besse Medical | 2.10% | $ 56,903,691 |
| Curascript | 2.30% | $ 5,843,383 |
| McKesson Specialty | 1.79% | $ 25,858,662 |
| Metro Medical | 2.00% | $ 284,091 |
| McKesson Plasma & Biologics | | |

349.     Regeneron also paid Credit Card Subsidies for sales of Eylea made through CuraScript and McKesson.

350.     For example, Regeneron paid physicians over $9.5 million in Credit Card Subsidies relating to over $387 million in Eylea sales made through McKesson between July 2016 and March 2017.

351.     Regeneron also over $8 million in Credit Card Subsidies relating to over $341 million in Eylea sales made through CuraScript between July 2016 and March 2017.

352.     Regeneron records show that, for the period from January 2018 through May 2021, Regeneron paid physicians over $250 million in Credit Card Subsidies for sales of Eylea made through Besse, McKesson, and CuraScript

353.     From 2012 to 2013, in submitting its quarterly ASP reports for Eylea to CMS,

Regeneron failed to report any portion of these Credit Card Subsidies.

354.    CMS relied on the accuracy of Regeneron's ASP submissions in setting payment rates under the Medicare Part B program.

355.    Regeneron's false ASP reports materially inflated Medicare Part B and Part C reimbursement rates for Eylea.

356.    These materially inflated reimbursement rates amounted to false prices, and Regeneron's submission of the false prices, caused the publication of false prices through recognized industry compendia such as MediSpan, that Medicare contractors used in determining amounts to pay for Eylea.

357.    As a result, Medicare Part B paid more than $25 billion for Eylea between 2012 and 2023.

### Lash Group's Data 2024 Breach

358.    On May 28, 2024, news broke that Lash Group experienced a data breach, this breach caused Lash to submit a notification to the California Attorney General regarding the breach. Becker, Zoey, Fierce Pharma, *Data breach at pharma partner Cencora puts sensitive patient information at risk*, May 28, 2024, available at https://www.fiercepharma.com/pharma/data-breach-pharma-partner-cencora-leaves-sensitive-patient-information-more-dozen (last visited June 24, 2024).

359.    This data breach caused Lash to send letters to patients of both Regeneron and Genentech because Lash operated PAPs for both manufacturers.

360.    This data breach shows that even in 2024, there is still ongoing relationships amongst Lash, Regeneron and Genentech.

### Defendants' Scheme Implicated Relations of Special Trust

361.    The Medicare Program is a "social insurance program" administered by the

Department of Health and Human Services ("HHS") (including through the OIG, and CMS). *See In re Tri Cnty. Home Health Servs., Inc.*, 230 B.R. 106, 114 (Bankr. W.D. Tenn. 1999).

362.     These government agencies are "charged with protecting the interests of Medicare beneficiaries and with the effective management of the public funds entrusted to the Medicare program." *Id.* at 113; *see also Neurological Associates-H Hooshmand v. Bowen*, 658 F. Supp. 468, 473 (S.D. Fla. 1987) (HHS "has a critical interest in maintaining the integrity of the Medicare program for the benefit of all, including the taxpaying public.").

363.     "The Government has a legitimate and significant interest in prohibiting financial fraud or acts of bribery being perpetrated upon Medicare providers. Fraudulent acts threaten the program's integrity." *Fischer v. United States*, 529 U.S. 667, 681 (2000).

364.     "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law[.]" *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 (1984).

365.     Those that are approved by HHS (including by CMS and the OIG) to participate in the Medicare Program, such as Defendants, have "a duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Id.*

366.     As stated above, in order to participate in the Medicare Program and facilitate payments of copay assistance to Medicare beneficiaries, PANF and CDF sought Advisory Opinions from the OIG.

367.     PANF and CDF repeatedly self-certified to the OIG that they knew and understood the rules and regulations applicable to the legitimate operation of a copay assistance charity, and self-certified that they were, and would continue to, abide by such rules and regulations.

368.     Based on these certifications and false promises, the OIG issued Advisory Opinions

permitting PANF and CDF to participate in the Medicare Program and operate a copay assistance charity.

369.     Through grant of these Advisory Opinions, the OIG required PANF and CDF to self-certify ongoing compliance with OIG regulations governing copay assistance programs. *See, e.g., U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*, 2020 WL 362717, at *5 (E.D. Pa. Jan. 22, 2020) ("CDF received a favorable advisory opinion from HHS OIG. The advisory opinion relied on CDF to self-certify compliance with certain safeguards.")

370.     Through grant of these Advisory Opinions, the OIG placed PANF and CDF in a position of trust with respect to HHS and Medicare payors. *See, e.g., United States v. Boyle*, 10 F.3d 485, 489 (7th Cir. 1993) (in determining whether a defendant occupies a "position of trust", a court must look "to the actual nature of the relationship and the responsibility the defendant is given")

371.     Through grant of these Advisory Opinions, the OIG vested a significant degree of authority and trust in PANF and CDF.

372.     PANF and CDF violated their positions of trust by engaging in the precise conduct that they promised to refrain from, and instead serving as conduits for Regeneron over the course of several years.

373.     Courts routinely find entities and individuals that are trusted to self-certify continued compliance with Medicare rules and regulations abuse their positions of trust when they fail to do so, particularly when noncompliance is difficult to detect.[22]

---

[22] *See, e.g., U.S. v. Glymph*, 96 F.3d 772 (1996) (Medicare participants occupy a position of trust with government payors); *United States v. Valez*, 168 F.3d 1137, 1139 (9th Cir. 1999); *U.S. v. Nathan*, 188 F.3d 190, 207 (3d Cir. 1999) (same); *United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010) (same); *United States v. Usman*, 460 F. App'x 414, 418 (5th Cir. 2012) (same); *U.S. v. Nowlin*, 640 Fed.Appx. 337, 350 (5th Cir. 2016) (same); *U.S. v. Buck*, 324 F.3d 786, 795 (5th Cir.

374. This position of trust is found to exist particularly when the defendant is trusted to self-certify and self-regulate its conduct in compliance with public-welfare legislation, such as Medicare.[23]

375. By nature of their relationships with the OIG, PANF and CDF occupied a position of trust, and owed a duty of fidelity, to the OIG and Medicare payors.

376. This position of trust is evident from the fact that PANF and CDF were required to self-certify and self-regulate their participation in the Medicare Program.

---

2003) (same); *United States v. Liss*, 265 F.3d 1220, 1229–30 (11th Cir. 2001) (same); *United States v. Sherman*, 160 F.3d 967, 968–71 (3d Cir. 1998) (same); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997) (same); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) (same); *United States v. Hoffer*, 129 F.3d 1196, 1204–06 (11th Cir. 1997) (same); *United States v. Willett*, 751 F.3d 335, 344 (5th Cir. 2014) (same); *United States v. St. Junius*, 739 F.3d 193, 209 (5th Cir. 2013) (same); *United States v. Njoku*, 737 F.3d 55, 78 (5th Cir. 2013) (same); *United States v. Conner*, 262 F. App'x 515, 518 (4th Cir. 2008) (same); *United States v. Erhart*, 415 F.3d 965, 972-73 (8th Cir. 2005) (same); *United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001) (same); *United States v. Hoogenboom*, 209 F.3d 665, 666, 671 (7th Cir. 2000) (same); *United States v. Gieger*, 190 F.3d 661, 663, 665 (5th Cir. 1999) (same); *United States v. Iloani*, 143 F.3d 921, 922-23 (5th Cir. 1998) (same); *United States v. Bolden*, 325 F.3d 471, 504-05 (4th Cir. 2003) (same); *United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998) (same); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) (same); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997) (same); *United States v. Garcia*, 211 F.3d 128 (11th Cir. 2000) (same); *United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (same); *United States v. Advantage Med. Transp. Inc*, 698 F. App'x 680, 690 (3d Cir. 2017), as amended (Aug. 16, 2017) (same); *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999) (same); *United States v. Read*, 710 F.3d 219, 228 (5th Cir. 2012) (same); *United States v. Valdez*, 726 F.3d 684, 687-89, 694 (5th Cir. 2013) (same); *United States v. Fairley*, 880 F.3d 198, 217 (5th Cir. 2018) (same); *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) (same).

[23] *See In re Tri Cnty. Home Health Servs., Inc.*, 230 B.R. 106, 114 (Bankr. W.D. Tenn. 1999) ("Medicare-a social insurance program-was designed expressly for the benefit of elderly and disabled citizens." ); *United States v. Snook*, 366 F.3d 439, 446 (7th Cir. 2004) (defendant found to occupy a position of trust in the context of the Clean Water Act); *United States v. Gonzalez–Alvarez*, 277 F.3d 73, 81–82 (1st Cir. 2002) (similar); *United States v. White*, 270 F.3d 356, 372-73 (6th Cir. 2001) (similar); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir. 1996) (similar); *United States v. Nathan*, 188 F.3d 190, 205–08 (3d Cir. 1999) (similar); *United States v. Glymph*, 96 F.3d 722, 727–28 (4th Cir. 1996) (similar); *United States v. Velez*, 185 F.3d 1048, 1050–51 (9th Cir. 1999) (similar); *United States v. Walker*, 490 F.3d 1282, 1300–01 (11th Cir. 2007) (similar); *United States v. Harness*, 180 F.3d 1232, 1236–37 (11th Cir. 1999) (similar); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir. 1996) (similar).

377.   This position of trust is further evident from the fact that PANF's noncompliance with the applicable rules and regulations was difficult to detect, and actually remained undetected over the course of several years.

378.   The fact that Regeneron's use of PANF and CDF as conduits went undetected for several years supports a finding that PANF and CDF occupied a position of special trust with Medicare payors. *See, e.g.*, *United States v. Babaria*, 775 F.3d 593, 597 (3d Cir. 2014).

379.   Regeneron's bribes to PANF and CDF to engage in conduct expressly prohibited by the OIG, and applicable rules and regulations (including the AKS), implicated PANF's and CDF's position of trust with the OIG and Medicare payors.

380.   PANF's and CDF's acceptance of Regeneron's bribes/kickbacks to disregard their duty of fidelity to the OIG and Medicare payors, threatened the "integrity and proper operation of the federal program[.]" *Salinas v. United States*, 522 U.S. 52, 61 (1997).

381.   Further, Regeneron's bribes to PANF and CDF corrupted their relationship of trust that existed between PANF and CDF and their lawful donors. A donor-donee relationship is a relationship of trust. *See, e.g., United States v. Bennett*, 161 F.3d 171, 196 (3d Cir. 1998) (executive of a charity occupies a fiduciary relationship with respect to its donors).

382.   Donors contribute to a non-profit based on the explicit promise that the non-profit operates lawfully and in furtherance of a charitable goal. Regeneron's bribes influenced PANF and CDF to betray the trust that their legitimate donors had placed in it.

383.   Regeneron funneled Eylea copay subsidies through PANF and CDF, with the intent of inducing physicians to recommend Medicare-subsidized purchases of its drugs and to induce patients to seek dispensing of those drugs.

384.   Courts have found such allegations sufficient to allege an interference with the

positions of trust that exist been providers and beneficiaries. *See, e.g., United States v. Regeneron Pharms*., Inc., 2023 WL 6296393, at *7 (D. Mass. Sept. 27, 2023); *United States v. Regeneron Pharms., Inc*., 2020 WL 7130004, at *2 (D. Mass. Dec. 4, 2020) ("The complaint alleges that the promise, or implicit guarantee, of copay assistance from CDF significantly altered the decision-making of patients and physicians.").

385.    In other words, a scheme allowing for the routine waiver of copayments for beneficiaries prescribed a certain drug induces both patients and physicians to seek Medicare-funded dispensing of that drug; thus, a drug manufacturer, like Regeneron, that guarantees copayment waiver for beneficiaries taking its product, engages in acts of bribery with the intent to implicate special trust relationships.[24]

386.    Additionally, physicians that participate in the Medicare Program occupy a position of trust with HHS and Medicare Payors, including Assignors.

387.    Regeneron's bribes to PANF and CDF guaranteed copayment waivers for all beneficiaries seeking Eylea also interfered with the position of trust occupied by Medicare providers, such as the prescribing physicians.

### *The Harmful Impact on Assignors and Class Members*

388.    Between 2011 and 2021 Assignors have paid more than $18,000,000.00 to cover the cost of Eylea for its members. As a result of Defendants' conduct, Assignors paid for tainted Eylea claims that they otherwise would not have and paid for Eylea at inflated prices.

---

[24] *See, e.g., Regeneron Pharms., Inc.*, 2020 WL 7130004, at *10 ("[T]he promise of copay waivers through CDF also provided remuneration to the physicians . . . by saving physicians' time that might be spent on explaining copays and assessing patients' financial hardship, removing the financial risk to physicians if they prescribed a drug that patients could not pay them back for, appeasing staff and patients, and generating increased business due to satisfied patients.") (citing cases); *United States ex rel. Strunck v. Mallinckrodt Ard LLC*, 2020 WL 362717, at *4 (E.D. Pa. Jan. 22, 2020) ("Because of the funds it established at CDF, Mallinckrodt was able to market Acthar as free to doctors and patients, regardless of its actual, exorbitant price.").

389. As discussed above, federal law strictly prohibits MA plans from paying for claims tainted by violations of federal law. Thus, all Eylea claims exposed to illegal remuneration were therefore tainted, and unpayable.

390. All claims exposed to illegal copay assistance (i.e., remuneration) provided by Regeneron, through its conduits, CDF and PANF, ran afoul of federal law and were therefore unpayable.

391. The manner in which Regeneron directed Eylea copay subsidies through CDF and PANF to patients constitutes illegal remuneration for several reasons including, but not limited to:

   a. Regeneron's copay assistance falls squarely within the definition of remuneration;

   b. CDF and PANF acted as conduits for Regeneron, in contravention of OIG guidelines and federal law;

   c. CDF and PANF falsely certified that they acted as independent charities;

   d. Regeneron falsely certified compliance with Medicare rules and regulations;

   e. Regeneron's copay assistance eliminated price sensitivity of Eylea, with the intent to induce patients and physicians to utilize Eylea over far cheaper, and equally effective alternatives; and

   f. As intended, Regeneron's copay assistance induced patients and physicians to utilize Eylea over far cheaper, and equally effective alternatives.

392. Regeneron also inflated prices for Eylea by violating mandatory disclosure regulations related to its price concessions:

   a. Regeneron offered credit card rebates to boost Eylea sales over far cheaper, and equally effective alternatives;

   b. Regeneron is required to report the ASP of Eylea to CMS on a quarterly basis;

   c. CMS requires reporting of any price concessions—including Regeneron's credit card rebates—to determine the appropriate reimbursement rate for Eylea;

   d. Regeneron deliberately withheld information regarding price concessions from CMS in order to inflate the ASP of Eylea;

84

      e.   CMS and MA plans relied on Regeneron's misrepresentations when determining the reimbursement rate for Eylea; and

      f.   As a result of Regeneron's quarterly misrepresentations of Eylea's ASP, Medicare and MA plans paid for Eylea claims at a higher rate than they otherwise would have. Thus, each payment for Eylea constitutes an overpayment due to Regeneron inflating Eylea's ASP.

393.    The allegations above, and those stated throughout the Complaint, resulted in economic damages to the Assignors and Class Members.

## VI.   CLASS ACTION ALLEGATIONS

394.    During the relevant period, various methods of communication were used to carry out the illegal acts alleged here, including the United States mail, interstate, and foreign travel, interstate and foreign telephone commerce, and interstate wire facilities. The activities of Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

395.    Plaintiffs bring this action on behalf of themselves and the following Class Members:

Federal RICO / State RICO / State Consumer Protection Statute Class 1:

All Medicare Advantage Organizations, Medicaid Managed Care Organizations, and at-risk, first-tier, and downstream entities in the United States and its territories that from at least 2011, through present, pursuant to Medicare and/or Medicaid contracts offering Medicare and Medicaid benefits, provided services, purchased Eylea, provided payment relating to, or possess the recovery rights for some or all of the purchase price of Eylea resulting from CDF's and PANF's co-payment assistance, and Regeneron's inflation of Eylea's ASP. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal RICO / State RICO / State Consumer Protection Statute Class 2:

All self-funded, insurers and related entities in the United States and its territories that from at least 2011, through present, provided services, purchased Eylea, provided payment relating to, or possess the recovery rights for some or all of the purchase price of Eyela resulting from CDF's and PANF's co-payment assistance, and Regeneron's inflation of Eylea's ASP.  This class excludes: (a) Defendants,

their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families, Plaintiffs bring this action under the Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class, as discussed in this Complaint, Defendants' Scheme resulted in inflated prices for, and increased quantities of, Eylea, the costs of which were borne by the Assignors and Class Members. The damages suffered by the Assignors apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations rights of recovery). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed many claimants such as Assignors, and other Medicare and Medicaid insurers, class resolution is an effective tool to redress the harm Assignors and Class Members have been deprived of money as a result of their obligation to pay for dispensed Eylea at artificially inflated quantities and prices, and because of Regeneron's concealment of price concessions offered to physicians purchasing and prescribing Eylea. But for Defendants' conduct, Assignors and Class Members would have paid less for Eylea during the relevant time.

396.   The Class Members claims are properly brought and should be maintained as a nationwide class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

Numerosity: The Class Members are so numerous that joinder is impracticable. Plaintiffs believe the Class includes thousands of insurers that paid for hundreds of thousands, if not millions, of Eylea prescriptions. There are thousands of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States that sustained damages as a result of induced purchases of Eylea at inflated prices caused by Defendants' conduct. Thus, the numerosity element for class certification is met.

Commonality: Defendants' misconduct was directed at all Class Members. Questions of law or fact are common to all Class Members. Defendants' co-pay Scheme and racketeering activity carried out by their enterprise have a common, adverse effect on all Class Members. Thus, common questions of law or fact are prevalent throughout the class, such as whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' payment for Eylea. Each Class Member shares the same needed remedy—namely payment for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' co-pay Scheme and racketeering activity that caused the Assignors and Class Members to pay inflated prices and inflated quantities of Eylea.

Typicality: Plaintiffs' claims are typical of the claims of the Class Members because their claims arise from the same course of conduct by Defendants, namely Defendants' formation of their co-pay Scheme and racketeering activity unlawfully

causing Class Members to pay pharmacies for the over-dispensing Eylea at inflated prices and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Class Members.

Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' interests in vindicating these claims are shared with all of the Class Members. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular experience with class action consumer protection and RICO litigation in the pharmaceutical industry.

397.    The Classes properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Under Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class. Defendants deliberately conspired to cause Assignors to pay for Eylea through the formation of their co-pay Scheme that subsequently resulted in the submission and payment of inflated prices for Eylea by Assignors and the Class Members that otherwise would not have been paid.

398.    Assignors and Class Members paid for Eylea prescriptions that they otherwise would not have paid but for Defendants' co-pay Scheme and racketeering activity.

399.    Additional questions of law and fact common to some or all of the Class Members include:

    a.  Whether Defendants engaged in a bribery scheme and thereby violated the AKS, the applicable state bribery laws, the applicable OIG regulations, the Travel Act, and mail and wire fraud statutes;

    b.  The effect of such bribery scheme on the quantities dispensed and prices of Eylea;

    c.  The effect of Regeneron's concealment of price concessions to inflate Eylea's ASP; and

    d.  The quantum of overcharges paid by the Assignors and Class Members in the aggregate.

400.    Class action treatment is a superior method for the fair and efficient adjudication of

the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

401.    Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

### *Fraudulent Concealment Tolling*

402.    The claims asserted in this Complaint have been tolled as a matter of law as Defendants took affirmative steps to conceal the wrongful conduct alleged here including, inter alia, Regeneron's use of CDF and PANF as a conduit and concealing such use under the guise of "donations" to an "independent" co-payment assistance charity.

403.    The claims asserted in this Complaint have been tolled as a matter of law as CDF and PANF repeatedly and continuously took affirmative steps to conceal the wrongful conduct alleged herein by misleading the OIG, DOJ, health care providers, certain pharmacies, beneficiaries, insurers, and the general public, into believing it was operating a legitimate, legal, and independent 501(c)(3) charitable organization, when in reality, it was serving as an illegal conduit for Regeneron.

404.    The claims asserted in this Complaint have been tolled as a matter of law as Regeneron concealed the true of its credit card rebates (i.e., price concessions) in order to inflate the ASP of Eylea.

*Discovery Rule Tolling*

405.     Assignors did not know, and no reasonable way of discovering Defendants' Scheme until it became public knowledge as a result of the DOJ's Complaint(s), at the earliest.

406.     Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that Defendants were engaged in and concealing the conduct alleged herein.

407.     Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that the Defendants were engaged in the alleged Scheme, nor would a reasonable diligent investigation have disclosed the facts.

*Continuing Violation Doctrine*

408.     The Complaint alleges a continuing course of conduct, and Defendants' unlawful conduct has inflicted continuing and accumulating harm. As demonstrated above, Defendants have continued the unlawful copay scheme long after 2014. Moreover, Plaintiffs did not know, nor could have known of Regeneron's efforts to inflate Eylea's ASP which span the entirety of Eylea's availability. Regeneron has continued its practice of bribery and concealment since Eylea was launched.

*Equitable Tolling*

409.     Defendants were under a continuous duty to disclose to Assignors and Class Members the existence and true nature of the Co-Payment Scheme, including the subsequent obligations for payment triggered by Defendant's misconduct.

410.     The existence of Defendants' co-payment assistance scheme was a material fact, and Defendants concealed its existence and instead falsely represented that they were in compliance with federal regulations including the FCA and AKS. When Defendants made these misrepresentations and concealed their co-payment assistance scheme, they had knowledge of the

facts surrounding the scheme's existence. Defendants concealed the co-payment assistance conspiracy scheme and made misrepresentations about it with the intention that Assignors and Class Members would rely on said misrepresentations and would pay for Eylea. Defendants' concealment induced Assignors and Class Members to reasonably rely and act upon these misrepresentations and were misled into paying for Eylea. *See Safe Env't of Am., Inc. v. Emps. Ins. of Wausau*, 278 F. Supp. 2d 121, 126–27 (D. Mass. 2003).

411.    Regeneron was under a continuous duty to disclose the existence of any price concessions, such as credit card rebates, and other gifts, provided to physicians. Regeneron intentionally concealed the true nature of these price concessions in order to inflate the ASP for Eylea. The existence of Regeneron's price concessions was a material fact, and Regeneron concealed its existence in violation of mandatory CMS reporting requirements.

412.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## VIII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of 18 U.S.C. § 1964(c) Through the Use of the Co-Payment Scheme**
*Against All Defendants*

413.    Plaintiffs re-allege and incorporate by reference paragraphs 1–411 of this Complaint as if fully set forth herein.

414.    At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

415.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

416.   Section 1964(c) provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The elements of a RICO claim under § 1964(c) pursuant to a violation of§ 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### *Description of the Co-Payment Circumvention Enterprise*

417.   RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union group or individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

418.   Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

419.   The Co-Payment Circumvention Enterprise is an association-in-fact enterprise under 18 U.S.C. § 1961(4), consisting of Defendants Regeneron, ABC, CDF, PANF, Besse, and the Lash Group, including their directors, officers, employees, and agents.

420.   The Co-Payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-Payment Circumvention Enterprise was created and used as a tool to carry out a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Co-Payment Circumvention Enterprise.

421.   The Co-Payment Circumvention Enterprise had a common purpose that united its members. One purpose was to defraud Medicare payors and steal funds from the Medicare Trust

Fund by circumventing Medicare's cost-sharing obligations. Another purpose was to generate personal profits for Defendants' executives from unlawful bribes and kickbacks.

422.    Defendants' common purposes were, among other things, (1) growing CDF's and PANF's fund and CDF's and PANF's executive compensation; (2) eliminating price sensitivity for patients and health care providers; (3) misleading government agencies, insurers, health care providers, and beneficiaries regarding the legitimacy of CDF's and PANF's operations and its conduct; (4) applying to Medicare and Medicaid programs on behalf of beneficiaries; and (5) violating OIG regulations and providing data to allow Regeneron to conduct continuous ROI calculations, all of which resulted in the unlawful depletion of state and federal dollars, increased the number of patients who had their drugs purchased by Assignors and Class Members, and increased the personal gains received by Defendants' executives through the payment of AKS-tainted claims and drugs at inflated prices.

423.    By funneling patients into CDFs and PANF's co-pay assistance funds, the Co-Payment Circumvention Enterprise increased Regeneron's number of covered "customers," thereby triggering the Assignors' and Class Members' coverage obligations for their Enrollees and eliminating price sensitivity of Eylea.

424.    Each of the Defendants received substantial revenue from participating in the Co-Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have been without such Enterprise.

425.    Each portion of the Enterprise benefitted as intended from the existence of the other parts.

426.    The Co-Payment Circumvention Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the

Defendants.

427.    There were interpersonal relationships between those associated with the Co-Payment Circumvention Enterprise. This includes relationships (1) among CDF's and PANF's officers and directors and relationships among Regeneron's officers, directors, principals, and agents and the Lash Group's and ABC's officers, directors, principals and agents; and (2) relationships between Regeneron, CDF, PANF, the Lash Group, and ABC. This is evidenced by routine communications (through the U.S. Mail and Wire) between Regeneron and CDF/PANF to ensure that its "donations" were sufficient to drive increased profits. The Lash Group would facilitate this process by sharing CDF and PANF data with Regeneron to ensure that Regeneron's "donations" achieved their proper purpose of paying co-pays for Eylea, thereby increasing profits for Regeneron and substantially depleting state and federal funds. Regeneron CDF, and PANF knew and intended the Lash Group to facilitate this illegal sharing of information.

428.    The OIG explicitly warned CDF and PANF not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and CDF and PANF certified its understanding and compliance with the OIG's warnings. But Defendants participated in this conduct anyway.

429.    Regeneron, CDF, and PANF were communicating—directly and through the Lash Group—information important to their Scheme through the mail and wires to profit illegally and that they had a relationship.

430.    The Co-Payment Circumvention Enterprise had longevity sufficient to permit its associates to pursue the enterprise's purpose. Since at least 2012, Regeneron made "donations" to CDF, a purportedly "independent" charity, and CDF continued to increase their executive compensation. As part of the distribution chain for Eylea, increased the number of prescriptions

they could fill by ensuring Regeneron had sufficient data from CDF and PANF to verify that they used Regeneron's "donations" to pay the co-pays of Eylea patients. Regeneron further insulated the price sensitivity of Eylea. Regeneron's use of anticompetitive and illegal tactics increased the number of "customers" buying Eylea, facilitating increased profits.

431.    Regeneron carried out its business activities both with and without CDF, PANF the Lash Group, and ABC, including using other co-payment charities. Similarly, CDF and PANF operated other funds without Regeneron. ABC and the Lash Group also conducted other business apart from CDF, PANF, and Regeneron. The Scheme thus did not involve parallel conduct because the Defendants participate in transactions with co-payment charities that do not result violations of the AKS, FCA, RICO, Consumer Protection Laws, OIG regulations, or other state and federal laws.

### Conduct of the Enterprise's Affairs

432.    Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-Payment Circumvention Enterprise's affairs. Each Defendant was part of the Co-Payment Circumvention Enterprise and each operated and managed the Co-Payment Circumvention Enterprise. Such participation included, but is not limited to: (1) CDF, PANF shared data (through the U.S. mail and wire facilities) with Regeneron and the Lash Group, and the Lash Group shared data (through the U.S. mail and wire facilities) with Regeneron, so Regeneron could effectively conduct ROI analyses on the amounts of Regeneron's "donations" to CDF and PANF for Eylea co-pays; (2) Regeneron provided necessary bribes, disguised as donations, for the co-payments, thus triggering the payment obligations of Assignors; (3) CDF, PANF, the Lash Group, and Regeneron steered and funneled patients into CDF's and PANF's funds; and (4) CDF, PANF, and Regeneron coordinated the establishment of the Wet AMD funds to subsidize patient co- payments, thus eliminating price sensitivity and raising the quantity of

Eylea dispensed.

433.   At all relevant times, each Defendant was aware of the Co-Payment Circumvention Enterprise's conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

<div align="center">***Defendants' Pattern of Racketeering Activity***</div>

434.   To carry out their illegal and collusive bribery Scheme, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-Payment Circumvention Enterprise through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), and employed the use of the mail, wire, and other facilities in interstate commerce, to promote, manage, establish, and carry out the Co-Payment Circumvention Enterprise in violation of 18 U.S.C. § 1952 (Travel Act), § 1341 (mail fraud), and § 1343 (wire fraud).

435.   Defendants intended to, and in fact did, commit bribery in violation of state and federal law, specifically 42 U.S.C. § 1320a-7b; Conn. Gen. Stat. §§ 53a-161c and 53a-161d; Fla. Stat. §§ 456.054 and 817.505; 740 Ill. Comp. Stat. 92/5; Mass. Gen. Laws ch. 175H, § 3; Mo. Rev. Stat. § 191.905; 5 R.I. Gen. Laws § 5-48.1-3; and Tex. Occ. Code Ann. § 102.001 (collectively, "unlawful activity"). Defendants used interstate mail and wire facilities with the intent to (1) distribute the proceeds from this unlawful activity and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on of this unlawful activity.

436.   Defendants' pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail and interstate wire facilities to further the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes an instance of "racketeering activity" under 18 U.S.C. § 1961(1)(B) by violating the underlying predicate acts of § 1952, § 1341, § 1343. Collectively, these violations constitute a "pattern of racketeering activity," under 18 U.S.C. § 1961(5), to advance Defendants' intentional

<div align="center">95</div>

and illegal Scheme.

437.    Defendants engaged in a Scheme to profit at the direct expense of insurers, including the Assignors and Class Members. They funneled and steered patients into CDF's and PANF's copayment assistance program, knowing insurers such as the Assignors and Class Members would ultimately bear the cost of Eylea. Defendants knew their Scheme to funnel, steer, and refer were violative of federal and state laws including, but not limited to, the AKS and the FCA and that they were transmitting false and illegal information through mail and wire communications.

438.    Defendants' use of the mails and wires to perpetuate their Co-Payment Circumvention Enterprise involved thousands of communications which involved, among others, the following:

    a.    Communications from Regeneron, CDF, PANF, and the Lash Group to patients, steering them to Regeneron's and CDF's and PANF's co-payment assistance program;

    b.    Transmittal of bribes, disguised as donations, by Regeneron to CDF and PANF, which were used, in part, to pay the co-payments of Eylea "customers";

    c.    Submission of certifications by Regeneron, PANF, and CDF, in which they claimed to be in compliance with federal law and OIG regulations;

    d.    Submissions of data from CDF, PANF to Regeneron and the Lash Group, permitting Regeneron to conduct ROI analyses on its "donations" to CDF and PANF, to forecast the ROI resulting from said "donations" and to see how much more revenue it could generate by increasing its "donations";

    e.    Communications between CDF, PANF, and Regeneron to ensure that CDF and PANF's wet AMD funds were open to patients seeking copay assistance for Eylea;

    f.    Certifications by CDF and PANF that it would determine eligibility according to a "uniform measure of financial need that is applied in a consistent manner" when in fact CDF and PANF prioritized patients taking Eylea based on Regeneron's bribes, not financial need;

    g.    Causing false claims, in violation of the FCA and AKS, to be submitted by innocent, non-party pharmacies to the Assignors and Class Members;

h. Using the mail and wire to mislead the government agencies (i.e., the OIG, IRS, DOJ, and state departments of record) through false certifications and misrepresentations;

i. Misleading insurers, health care providers, investors, government agencies, and the general public into believing the legitimacy of Defendants' Scheme; and

j. Regeneron used the mail and wire to mislead CMS by failing to disclose price concessions offered to physicians, thereby inflating the ASP of Eylea.

439.    Defendants violated the Travel Act by using the mail and wire facilities to commit, promote, manage, establish, and carry on their bribery and/or kickback scheme in violation of the laws of the United States, namely, the AKS, as well as the laws of several States, namely, (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Mo. Rev. Stat. § 191.905; (6) 5 R.I. Gen. Laws § 5-48.1-3; and (7) Tex. Occ. Code Ann. § 102.001. Defendants further used the mail and wire facilities to distribute the proceeds of their bribery and/or kickback scheme.5 Defendants' activity was intended to and did in fact violate the federal AKS by knowingly and willfully offering (by Regeneron) and accepting (by CDF and PANF) bribes (i.e., "donations") in return for CDF and PANF referring, accepting referrals for, and arranging for Assignors and Class Members to buy, and beneficiaries to receive Eylea.

440.    Defendants' activity was intended to and did in fact violate Conn. Gen. Stat. §§ 53a161c and 53a-161d. These two laws prohibit two sides of the same scheme. Under Conn. Gen. Stat. § 53a-161c(a), it is illegal to "knowingly solicit[], accept[] or agree[] to accept any benefit, in cash or in kind, from another person upon an agreement or understanding that such benefit will influence such person's conduct in relation to referring an individual or arranging for the referral of an individual for the furnishing of any goods, facilities or services to such other person under contract to provide goods, facilities or services to a local, state or federal agency."

This was violated by PANF and CDF accepting money from Regeneron to influence the charities' conduct in referring and arranging for the referral of beneficiaries of Assignors and Class Members, who are under contract to provide health insurance benefits on behalf of state and federal agencies (e.g., CMS). Similarly, it is illegal under Conn. Gen. Stat. § 53a-161d(a) to "knowingly offer[] or pay[] any benefit, in cash or kind, to any person with intent to influence such person: (1) To refer an individual, or to arrange for the referral of an individual, for the furnishing of any goods, facilities or services for which a claim for benefits or reimbursement has been filed with a local, state or federal agency; or (2) to purchase, lease, order or arrange for or recommend the purchasing, leasing or ordering of any goods, facilities or services for which a claim of benefits or reimbursement has been filed with a local, state or federal agency." Defendants' Scheme operated in Connecticut and thereby violated these state laws.

441.    Defendants' activity was intended to and did in fact violate Fla. Stat. §§ 456.054 and 817.505. Specifically, under Fla. Stat. § 456.054(2) "[i]t is unlawful for . . . any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Regeneron is a provider of health care services and paid kickbacks to PANF and CDF, and to pharmacies through PANF and CDF, for referring patients to receive Regeneron's drugs. Similarly, under Fla. Stat. § 817.505(1) it is illegal "for any person . . . to (a) [o]ffer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . to induce the referral of a patient or patronage to or from a health care provider or health care facility." Likewise, subsection (b) prohibits soliciting or receiving the same. Here, Regeneron paid, and PANF and CDF received, bribes to induce the referral of patients to receive Eylea. Defendants' Scheme operated in Florida and resulted in claims being submitted therein and thereby violated these state laws.

442.     Defendants' activity was intended to and did in fact violate 740 Ill. Comp. Stat. 92/5 "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." Regeneron bribed PANF and CDF to procure patients to receive co-payment assistance from Regeneron for Regeneron's drugs knowing and requiring that these patients were insured and would submit a claim to Assignors and Class Members. Defendants' Scheme operated in Illinois and resulted in claims being submitted therein and thereby violated this state law.

443.     Defendants' activity was intended to and did in fact violate Mass. Gen. Laws ch. 175H, § 3. Specifically, it is illegal for any person to "offer[] or pay[] [(or solicit or receive)] any remuneration, including any bribe or rebate, except as provided in subsection (b), directly or indirectly, overtly or covertly, in cash or in kind to induce any person to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service, or item for which payment is or may be made in whole or in part by a health care insurer." Mass. Gen. Laws ch. 175H, § 3. Regeneron offered and paid, and PANF and CDF solicited and received, bribes in return for PANF and CDF referring patients to receive Regeneron's drugs and arranging for the purchase of same by funneling Regeneron's money to these patients. Defendants' Scheme operated in Massachusetts and resulted in claims being submitted therein and thereby violated this state law.

444.     Defendants' activity was intended to and did in fact violate Mo. Rev. Stat. § 191.905. Under Missouri law, it is illegal for any person to "knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for: (1) Referring another person to a health care provider for the

furnishing or arranging for the furnishing of any health care;[25] or (2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care." Mo. Rev. Stat. § 191.905(2). It is also illegal for any person to "knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care." Mo. Rev. Stat. § 191.905(3). Regeneron offered and paid, and PANF and CDF solicited and received, bribes in return for PANF and CDF referring patients to receive Regeneron's drugs and arranging for the purchase of same by funneling Regeneron's money to these patients. Defendants' Scheme operated in Missouri and resulted in claims being submitted therein and thereby violated this state law.

445.    Defendants' activity was intended to and did in fact violate 5 R.I. Gen. Laws § 5-48.1-3. Under Rhode Island law, it is illegal for any person to "knowingly and willfully solicit[] or receive[] [(or offer or pay)] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind; (1) in return for referring an individual to a person for the furnishing, or arranging for the furnishing, of any health care service or item; or (2) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering, any health care good, facility, service, or item." 5 R.I. Gen. Laws § 5-48.1-3. Regeneron offered and paid, and PANF and CDF solicited and received, bribes in return for PANF and CDF referring patients to receive Regeneron's drugs and arranging for the purchase of same by funneling Regeneron's money to these patients. Defendants' Scheme operated in Rhode Island and resulted in claims being submitted therein and thereby violated this state law.

---

[25] Under Mo. Rev. Stat. § 191.900, "health care" is defined as "any service, assistance, care, product, device or thing provided pursuant to a medical assistance program, or for which payment is requested or received, in whole or part, pursuant to a medical assistance program." Mo. Rev. Stat. § 191.900(4).

446.    Defendants' activity was intended to and did in fact violate Tex. Occ. Code Ann. § 102.001. Under Texas Law, it illegal for a person to "knowingly offer[] to pay or agrees to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency." Tex. Occ. Code Ann. § 102.001. Regeneron offered and paid, and PANF and CDF solicited and received, bribes in return for PANF and CDF referring patients to receive Regeneron's drugs. Defendants' Scheme operated in Texas and resulted in claims being submitted therein and thereby violated this state law.

447.    The predicate act violations of the Travel Act, as well as mail and wire fraud, had the same purpose; that is, to make money by growing the co-pay assistance program as large as possible so CDF's and PANF's officers and directors could justify increasing their compensation, in order to induce patients and physicians to purchase and prescribe Eylea, thereby increasing their own profits, and so Regeneron could get as many "customers" for the Eylea as possible, at the expense of the Assignors and Class Members.

448.    All of the predicate acts detailed above, including the certifications made by Regeneron, CDF, and PANF, as well as the wire communications in furtherance of their Scheme, were for the purpose of the Scheme.

449.    If CDF and PANF had not falsely certified that they used uniform measures of financial eligibility, and if Regeneron, the Lash Group, CDF, and PANF had not deceptively caused innocent, non-party physicians to submit claims for payment, the Assignors and Class Members would not have paid artificially inflated prices or for improperly increased quantities of Eylea. Defendants caused innocent, non-party physicians to send false bills for payment over the mail and wire so Regeneron could make larger bribes to CDF and PANF, thereby inducing patients

and physicians to utilize Eylea over far cheaper alternatives, in turn harming the Assignors and Class Members.

450.    If the Scheme did not exist, physicians would not have submitted the tainted claims to Assignors and Class Members. If the Scheme did not exist, Regeneron would not have been able to maintain Eylea's extremely high price and remain profitable to the extent that it was.

451.    These predicate acts allowed the continuance of the Scheme to increase the quantity of Eylea and maintain inflated prices. As a result, the Assignors and Class Members paid inflated prices for Eylea, and for more Eylea claims than they otherwise would have.

452.    As a result of Defendants' Scheme, Assignors and Class Members unknowingly paid tainted claims.

453.    These predicate acts perpetuated the Scheme to increase the prices and dispensed quantities of Eylea, over cheaper alternatives. As a result, the Assignors and Class Members paid the inflated prices for an improperly increased quantity of Eylea.

454.    Regeneron, CDF, PANF, and the Lash Group, including their officers, directors, agents, and principals, participated in all of the predicate acts. These individuals sent, or caused to be sent, all of the false certifications through the mail or wire facilities. These individuals communicated with each other, and others, in furtherance of the Scheme.

455.    The intended and most direct victims of the Scheme are the Assignors and Class Members.

456.    The violations of the Travel Act and mail and wire fraud included transmission of false claims and the unlawful transmission of data and communications to further the racketeering Scheme over a period of at least ten years involving harm to multiple parties.

457.    The Co-Payment Circumvention Enterprise's illegal Scheme and its predicate acts

proximately caused injury to the Assignors' and Class Members' business and property by triggering the Assignors' and Class Members' duty to purchase Eylea. Defendants' Scheme rendered the claims for Eylea unpayable, and Assignors and Class Members would not have (and could not have) paid if Defendants had not concealed their Scheme.

458.    Accordingly, Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused injuries and damages to the Assignors and Class Members. Defendants' actions entitle Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1964(d) Through the Co-Payment Scheme
*Against All Defendants*

459.    Plaintiffs re-allege and incorporate by reference paragraphs 1–411 of this Complaint as though set forth at length here.

460.    Section 1962(d) makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions.

461.    Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-Payment Circumvention Enterprise described previously, through a pattern of racketeering activity.

462.    Regeneron knowingly agreed with CDF, PANF, and the Lash Group that each would perform services that would facilitate the illicit activities of the Co-Payment Circumvention Enterprise. Regeneron, through CDF, PANF, and the Lash Group, steered patients to CDF's and PANF's co-payment assistance programs.

463.    Regeneron also provided CDF and PANF with bribes disguised as donations for

the charity to subsidize the co-payments of Eylea "customers" using the co-payment assistance programs.

464.     Regeneron also used Eylea data provided by CDF, the Lash Group, and PANF in violation of the AKS and FCA. The shared data allowed Regeneron to perform ROI analyses on its "donations" to forecast the effect of donations on revenue and profit. Regeneron thus set out a roadmap of illegal activities and profits.

465.     Regeneron, CDF, and PANF also caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

466.     Further, CDF and PANF knowingly agreed with Regeneron and the Lash Group that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that CDF and PANF performed were steering people towards their co-payment assistance funds.

467.     CDF and PANF caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

468.     CDF and PANF sent data to the Lash Group and Regeneron in violation of the AKS and FCA, so Regeneron could see how much money it was making from its "donations" to CDF and PANF, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Defendants did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-Payment Circumvention Enterprise. CDF and PANF knew that if Regeneron provided more "donations," Regeneron would make more money. Thus, by illegally providing data to Regeneron, CDF and PANF were soliciting greater contributions.

469.    Further, the Lash Group knowingly agreed with Regeneron, CDF, and PANF that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that the Lash Group performed were steering people towards CDF's and PANF's co-payment assistance funds by sharing CDF and PANF data with Regeneron to ensure Regeneron could verify that its "donations" provided co-pays for Eylea.

470.    Regeneron knowingly agreed with CDF, PANF, and the Lash Group that one or all of them would commit at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third- party to send false statements over the mails and wires). In short, Regeneron knew that it, the Lash Group, CDF, and PANF had to abide by the AKS and FCA, and it knew the Scheme would violate those statutes. Regeneron knew that CDF and PANF certified with the OIG that CDF and PANF would use a uniform measure of financial need when providing co-pay assistance, when in fact CDF and PANF were mere conduits to provide co-pay assistance for patients taking Eylea. Regeneron also knew that each time a physician treated a patient using CDF's and PANF's co-pay assistance, any certifications made, or claims submitted by the physician would be in violation of federal law.

471.    Defendants knew that any communication they had over the telephone, email, or text message in furtherance of the Scheme would be predicate acts. Each Defendant intended to further this endeavor, which, as described above, when completed, violated 18 U.S.C. § 1962(c) that proximately and directly injured the Assignors and Class Members.

472.    Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(d).

## THIRD CLAIM FOR RELIEF

### Violations of State Consumer Protection Laws
*Against All Defendants*

473.    Plaintiff re-allege and incorporate by reference paragraphs 1–411 of this Complaint as if fully set forth herein.

### (1) Connecticut Unfair Trade Practices Act
### (Conn. Gen. Stat. §§ 42-110a *et seq*.)

474.    To prevail under the Connecticut Unfair Trade Practices Act ("CUTPA"), Plaintiff must show: (1) Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) Defendants' practices resulted in an ascertainable loss of money or property. Conn. Gen. Stat. § 42-110b.

475.    An unfair act or practice can be any of the following: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

476.    A deceptive act or practice requires: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must have been likely to affect the plaintiff's decision or conduct.

477.    Defendants engaged in numerous deceptive acts or practices for purposes of CUTPA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron concealing the nature of its copay assistance program as well as the

price concessions from mandatory ASP reporting in order to raise Eylea prices.

478.    Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

479.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm.

480.    For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that all Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

481.    Defendants' conduct was the foreseeable result of Assignors paying for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

482.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Connecticut. For example, the following conduct occurred within the State of Connecticut: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with Connecticut residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with Connecticut medical physicians; the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to Connecticut residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

483.     For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Connecticut.

484.     The Assignors were harmed in the State of Connecticut for each purchase of Eylea within the state.

485.     Analysis of the Assignors' data identified one or more purchases of Eylea in the State of Connecticut. [*See* **Ex. A** – Regeneron Spreadsheets]

486.     Accordingly, Defendants violated CUTPA.

487.     As a result of the Scheme, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of Connecticut.

488.     Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Connecticut Attorney General and Commissioner of Consumer Protection.

489.     Plaintiffs are entitled to recover their actual damages, punitive damages, and

attorney's fees and costs.

### (2) Florida Deceptive & Unfair Practices Act
#### (Fla. Stat. §§ 501.201 *et seq.*)

490.    To prevail under the Florida Deceptive & Unfair Trade Practice Act ("FDUPTA"), Plaintiff must show: (1) Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) Defendants' practices resulted in an ascertainable loss of money or property. Fla. Stat. § 501.204(1).

491.    An unfair act or practice can be any of the following: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

492.    A deceptive act or practice requires: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must have been likely to affect the plaintiff's decision or conduct.

493.    Defendants engaged in numerous deceptive acts or practices for purposes of FDUPTA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

494.    Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended

ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

495.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that all Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

496.    Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

497.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Florida. For example, the following conduct occurred within the State of Florida: advertisement, transport, sale, and purchase of Eylea; solicitation of and

communication with Florida residents (including Assignors' beneficiaries and other patients) for

purchase of Eylea; solicitation of and communication with Florida medical physicians;  the transfer

and disbursement of Regeneron's illicit funds from CDF and PANF to Florida residents (including

Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for

payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable

claims induced by Defendants' Scheme; publication of misrepresentations regarding the

independence of CDF and PANF, and all false certifications of compliance with the federal and

state laws discussed herein.

498.    For the same reasons mentioned above, Defendants' conduct occurred within the

trade and commerce of Florida.

499.    The Assignors were harmed in the State of Florida for each purchase of Eylea

within the state.

500.    Analysis of the Assignors' data identified one or more purchases of Eylea in the

State of Florida. [*See* **Ex. A** – Regeneron Spreadsheets]

501.    Accordingly, Defendants violated FDUPTA.

502.    As a result of the Scheme, the Assignors paid more than $18,000,000.00 for Eylea,

including claims paid in the State of Florida.

503.    Plaintiffs seek to recover against each Defendant the amount of their actual

damages, attorney's fees, costs, and any other relief available.

### (3) Illinois Consumer Fraud & Deceptive Business Practices Act
**(815 Ill. Comp. Stat. 505/1 *et seq*.)**

504.    To prevail under Illinois Consumer Fraud Act ("ICFA"), Plaintiff must show: (1)

(1) a deceptive or unfair act or practice committed by the defendant; (2) the defendant's intent that

the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct

involving trade or commerce; (4) actual damages to the plaintiff; and (5) caused by defendant's acts or practices.

505.    Deceptive acts or practices include, but are not limited to, use or employment of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression, or omission of any material fact, with the intent that others rely upon the concealment, suppression, or omission of such fact in the conduct of any trade or commerce.

506.    A practice is unfair if the practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and/or (3) causes substantial injury to the plaintiff.

507.    An unfair act or practice can be any of the following: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

508.    A deceptive act or practice requires: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must have been likely to affect the plaintiff's decision or conduct.

509.    Defendants engaged in numerous deceptive acts or practices for purposes of ICFA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

510.    Defendants' conduct undermined and/or offends other significant public policy

considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

511.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that *all* Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

512.    Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

513.    Defendants' conduct alleged in this Complaint occurred throughout the United

States, including the State of Illinois. For example, the following conduct occurred within the State of Illinois: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with Illinois residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with Illinois medical physicians;  the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to Illinois residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

514.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Illinois.

515.    The Assignors were harmed in the State of Illinois for each purchase of Eylea within the State of Illinois.

516.    Analysis of the Assignors' data identified one or more purchases of Eylea in the State of Illinois [*See* **Ex. A** – Regeneron Spreadsheets]

517.    Accordingly, Defendants violated ICFA.

518.    Simultaneously with the filing of this Complaint, Plaintiff's served a copy on the Illinois Attorney General.

519.    As a result of Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of Illinois.

520.    Plaintiffs are entitled to recover three (3) times the amount of actual damages resulting from Defendants' violation together with costs and reasonable attorney's fees.

**(4) Massachusetts Regulation of Business Practice & Consumer Protection Act**
**(Mass. Gen. Laws Ch. 93A §§ 1 *et seq.*)**

521.    To establish a violation of the Massachusetts unfair and deceptive trade practice statute, a plaintiff must show (1) the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice; (2) a loss of money or property was suffered; and (3) defendant's unfair or deceptive act or practice caused the loss suffered. Mass. Gen. Laws. Ch. 93A §§ 9, 11.

522.    An act or practice is considered unfair if (1) the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) it is immoral, unethical, oppressive, or unscrupulous; and (3) it causes substantial injury to consumers, competitors, or businesspeople.

523.    Practices may be deemed deceptive where they could reasonably be found to have caused a person to act differently from the way they would have acted; conduct is deceptive when it tends to mislead.

524.    Defendants engaged in numerous deceptive acts or practices for purposes of Mass. Gen. Laws ch. 93A, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

525.    Defendants' conduct was immoral, unethical, and/or offended significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription

medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

526.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that *all* Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

527.    Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

528.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Massachusetts. For example, the following conduct occurred within the State of Massachusetts: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with Massachusetts residents (including Assignors' beneficiaries and other

patients) for purchase of Eylea; solicitation of and communication with Massachusetts medical physicians; the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to Massachusetts residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

529.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Massachusetts and primarily and substantially within the Commonwealth of Massachusetts.

530.    The Assignors were harmed in the State of Massachusetts for each purchase of Eylea within the Commonwealth of Massachusetts.

531.    Analysis of the Assignors' data identified one or more purchases of Eylea in the Commonwealth of Massachusetts. [*See* **Ex. A** – Regeneron Spreadsheets]

532.    Accordingly, Defendants violated Mass. Gen. Laws ch. 93A.

533.    As a result of the Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of Massachusetts.

534.    Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11. Plaintiffs also seek punitive damages, attorneys' fees and costs, and any other just and proper relief.

<center>

**(5) Minnesota Consumer Fraud Act**
**(Minn. Stat. §§ 325F.68 *et seq.*)**

</center>

535.    The Minnesota Consumer Fraud Act ("MCFA") makes unlawful the act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby.

536.    Defendants engaged in numerous unlawful acts practices for purposes of the MCFA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron misrepresenting the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

537.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that all Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

538.    Defendants' unlawful practices were made in connection with the sale and purchase

<center>118</center>

of Eylea. Thus, there is a sufficient causal nexus between Defendants' unlawful practices and Assignors paying for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable. Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Minnesota. For example, the following conduct occurred within the State of Minnesota: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with Minnesota residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with Minnesota medical physicians;  the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to Minnesota residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

539.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Minnesota.

540.    The Assignors were harmed in the State of Minnesota for each purchase of Eylea within the state.

541.    Analysis of the Assignors' data identified one or more purchases of Eylea in the State of Minnesota. [*See* **Ex. A** – Regeneron Spreadsheets]

542.    Accordingly, Defendants violated MCFA.

543.    As a result of Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of Minnesota.

544.    Plaintiffs are entitled to recover their actual damages, punitive damages, attorneys' fees and costs, and any other remedies that are just and proper.

### (6) Missouri Merchandising Practices Act
**(Mo. Ann. State. §§ 407.020 *et seq*.)**

545.    To state a cause of action under the Missouri Merchandising Practices Act ("MMPA"), a plaintiff must allege: (1) purchase a good or service; (2) primarily for personal or household purposes; and (3) an ascertainable loss of money or property; (4) as a result of, or caused by, the use or employment of a method, act, or practice declared unlawful under the MMPA.

546.    Unlawful practices include any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose.

547.    An ascertainable loss may be established by assertion of an economic injury and resulting damages.

548.    Defendants engaged in numerous unlawful acts practices for purposes of the MMPA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron misrepresenting the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

549.    Defendants further engaged in the concealment, omission, and/or suppression of material facts related to the sale and advertisement of Eylea, and solicitation for charitable purposes.

550.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that *all* Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

551.    Defendants' unlawful practices were made in connection with the sale and purchase of Eylea. Thus, there is a sufficient causal nexus between Defendants' unlawful practices and Assignors paying for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

552.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Missouri. For example, the following conduct occurred within the State of Missouri: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with Missouri residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with Missouri medical physicians;  the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to Missouri residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted,

unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

553.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Missouri.

554.    Assignors purchased Eylea for and/or behalf of their beneficiaries' personal and household purposes.

555.    The Assignors were harmed in the State of Missouri for each purchase of Eylea within the state.

556.    Analysis of the Assignors' data identified one or more purchases of Eylea in the State of Missouri. [*See* **Ex. A** – Regeneron Spreadsheets]

557.    Accordingly, Defendants violated MMPA.

558.    As a result of Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of Missouri.

559.    Plaintiffs are entitled to recover their actual damages, punitive damages, attorneys' fees and costs, and any other remedies that are just and proper.

### (7) New Jersey Consumer Fraud Act
#### (N.J. Stat. Ann. §§ 56:8-1 *et seq.*)

560.    To state a cause of action under the New Jersey Consumer Fraud Act ("NJCFA"), a plaintiff must allege: (1) an unlawful practice by defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements.

561.    Unlawful practices include deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the

sale or advertisement of any merchandise. An ascertainable loss may be established by assertion of an economic injury and resulting damages.

562.    Defendants engaged in numerous unlawful acts practices for purposes of the NJCFA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron misrepresenting the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

563.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that all Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

564.    Defendants' unlawful practices were made in connection with the sale and purchase of Eylea. Thus, there is a sufficient causal nexus between Defendants' unlawful practices and Assignors paying for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable. Defendants' conduct alleged in this Complaint occurred throughout the

United States, including the State of New Jersey. For example, the following conduct occurred within the State of New Jersey: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with New Jersey residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with New Jersey medical physicians;  the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to New Jersey residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

565.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of New Jersey.

566.    The Assignors were harmed in the State of New Jersey for each purchase of Eylea within the State of New Jersey.

567.    Analysis of the Assignors' data identified one or more purchases of Eylea in the State of New Jersey. [*See* **Ex. A** – Regeneron Spreadsheets]

568.    Accordingly, Defendants violated NJCFA.

569.    As a result of Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of New Jersey.

570.    Plaintiffs are entitled to recover their actual damages, punitive damages, attorneys' fees and costs, and any other remedies that are just and proper.

### (8) New York Consumer Fraud & Deceptive Business Practices Act
### (N.Y. Gen. Bus. Law §§ 349 *et seq.*)

571.    To establish a violation a N.Y. Gen. Bus. Law § 349 violation, plaintiff must allege

that defendant engaged in (1) a deceptive act or practice in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York that is (2) consumer-oriented, and (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.

572.    Consumer-oriented conduct includes any conduct that potentially affects similarly situated consumers or that has a broader impact on consumers at large.

573.    The scope of N.Y. Gen. Bus. Law § 349 includes businesses, commercial entities, and individual consumers. *See N. State Autoban, Inc., v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 104 (N.Y. App. Div. 2012) ("[L]imiting the scope of § 349 to only consumers" would be "in contravention of the statute's plain language permitting recovery of any person injured by reason of any violation.").

574.    A deceptive act or practice is defined as an act likely to mislead a reasonable consumer acting reasonably under the circumstances.

575.    Defendants' conduct constitutes deceptive acts or practices for purposes of N.Y. Gen. Bus. Law § 349. Defendants' deceptive acts include, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

576.    The above conduct misled Assignors, individuals—such as beneficiaries and other patients—other MA plans, Medicare, and physicians thereby inducing purchases and prescriptions of Eylea.

577.    Defendants' false statements, certifications, misrepresentations, or omissions tend

to, and were designed to, manipulate, induce, or mislead Assignors and the public at large into paying for tainted claims, which is precisely what occurred here.

578.    Defendants' conduct is consumer-oriented because it affected similarly situated entities and the public at large. For instance, Defendants' efforts undermined the competitive market for wet AMD drugs, raised prices across the board for Medicare, MA plans, and patients who were unable to obtain copay assistance and therefore had to pay higher copays for Eylea. Defendants' conduct also implicated significant public policy concerns including: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

579.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that *all* Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea

claims that would not have otherwise been paid.

580.     Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

581.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of New York. For example, the following conduct occurred within the State of New York: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with New York residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with New York medical physicians;  the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to New York residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

582.     For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of New York and primarily and substantially within the State of New York.

583.     The Assignors were harmed in the State of New York for each purchase of Eylea within the state.

584.     Analysis of the Assignors' data identified one or more purchases of Eylea in the State of New York. [*See* **Ex. A** – Regeneron Spreadsheets]

585.     Accordingly, Defendants violated N.Y. Gen. Bus. Law § 349.

586.    As a result of the Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of New York.

587.    As a result of the foregoing willful, knowing, and wrongful conduct alleged herein, Assignors suffered damages, and seek all just and proper remedies and any other appropriate relief available.

<div align="center">

**(9) Washington Consumer Protection Act**
**(Wash. Rev. Code §§ 19.86.919 *et seq*.)**

</div>

588.    To prevail under the Washington Consumer Protraction Act ("WCPA"), a plaintiff must establish: (1) the defendant has engaged in an unfair or deceptive or practice; (2) in trade or commerce; (3) that impacts the public interest; (4) the plaintiff suffered an injury in his business or property; and (5) a causal link exists between the conduct and injury.

589.    An act or practice is "unfair" if: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

590.    An act or practice is "deceptive" if: there is a representation, omission or practice that is likely to mislead a reasonable consumer.

591.    Defendants engaged in numerous deceptive acts or practices for purposes of WCPA, including, but not limited to: PANF and CDF publishing false certifications of compliance with OIG guidelines and federal law; Lash Group and Regeneron misrepresenting the charities as "independent" on advertisements and websites; Regeneron certifying compliance with federal laws; and Regeneron the nature of its copay assistance program and concealing price concessions from mandatory ASP reporting in order to raise Eylea prices.

592.    Defendants' conduct was immoral, unethical, and/or offended significant public

policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; MA Plans intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

593.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Regeneron concealed price concessions to inflate the ASP of Eylea. In doing so, Regeneron ensured that all Eylea payments made by MA Plans would be at a higher cost than they otherwise would have but for Regeneron's concealment of price concessions; Defendants successfully abused copay assistance programs to eliminate price sensitivity for Eylea and induce patients and physicians to increase utilization of Eylea over far cheaper and equally effective alternative treatments; Regeneron, CDF, and PANF all certified compliance with federal law and/or OIG guidelines to ensure the illegal conduct remained hidden and MA plans would pay for tainted Eylea claims that would not have otherwise been paid.

594.    Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Eylea at inflated prices; Assignors paying for more Eylea claims over cheaper and equally effective alternatives; and Assignors paying for Eylea claims that were tainted, and therefore unpayable.

595.    Defendants' conduct alleged in this Complaint occurred throughout the United

States, including the State of Washington. For example, the following conduct occurred within the State of Washington: advertisement, transport, sale, and purchase of Eylea; solicitation of and communication with Washington residents (including Assignors' beneficiaries and other patients) for purchase of Eylea; solicitation of and communication with Washington medical physicians; the transfer and disbursement of Regeneron's illicit funds from CDF and PANF to Washington residents (including Assignors' beneficiaries and other patients); the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Scheme; publication of misrepresentations regarding the independence of CDF and PANF, and all false certifications of compliance with the federal and state laws discussed herein.

596.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Washington.

597.    The Assignors were harmed in the State of Washington for each purchase of Eylea within the state.

598.    Analysis of the Assignors' data identified one or more purchases of Eylea in the State of Washington. [*See* **Ex. A** – Regeneron Spreadsheets]

599.    Accordingly, Defendants violated the WCPA.

600.    As a result of Defendants' conduct, the Assignors paid more than $18,000,000.00 for Eylea, including claims paid in the State of Washington.

601.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees and costs, and any other remedies that are just and proper.

## **FOURTH CLAIM FOR RELIEF**

### **Unjust Enrichment Under State Law**
*Against All Defendants*

602.    Plaintiff re-allege and incorporate by reference paragraphs 1–411 of this Complaint as if fully set forth herein.

603.    Plaintiffs' analysis of its Assignors' data identified one or more payment/purchase for Eylea in each of the following States and Territories: Arizona; Colorado; Connecticut; Florida; Georgia; Illinois; Indiana; Iowa; Massachusetts; Mississippi; Missouri; New Hampshire; New Jersey; New York; North Carolina; Rhode Island; Tennessee; Texas; and Washington.

604.    The laws of each state are materially similar and require a plaintiff to demonstrate the following elements: (1) the plaintiff conferred a benefit onto the defendant(s); (2) the defendant had an appreciation or knowledge of the benefit; and (3) the retention of the benefit by the defendant(s) under the circumstances would be unjust.[26]

605.    Defendants' conduct directly resulted in the unjust enrichment of Defendants through the sale of Eylea in each State and Territory mentioned above.

606.    Defendants used the copay scheme to increase and/or maintain Eylea prices at exorbitant levels. Additionally, Regeneron inflated Eylea prices by misrepresenting the ASP for Eylea.

607.    The copay scheme intended to induce patients and physicians to utilize Eylea over far cheaper, equally effective alternatives.

608.    Defendants benefitted from mountainous profits from Eylea sales at the expense of Assignors.

609.    Defendants knowingly and voluntarily accepted and retained those benefits and have been unjustly enriched as a result, to Assignors' unjust detriment.

---

[26] For those states where unjust enrichment is not a standalone cause of action, Plaintiffs seek restitution, as an alternative form of relief, for the unjust enrichment arising from Defendants' misconduct.

610.    By virtue of the forgoing, Assignors are entitled to recover the amount of Defendants' unjust enrichment, to be determined at trial, and other relief.

### FIFTH CLAIM FOR RELIEF

**Violations of the Civil Remedies for Criminal Practices Act (Fla. Stat. §§ 772.101 *et seq*)**
*Against All Defendants*

611.    Plaintiff re-allege and incorporate by reference paragraphs 1–411 of this Complaint as if fully set forth herein.

612.    At all times, as set forth above, Defendants' actions were unlawful under Fla. Stat. § 772.103(3), as they were all "employed by, or associated with, any enterprise through a pattern of criminal activity."

613.    Defendants violated Fla. Stat. §§ 772.101 et seq., by participating in or conducting the affairs of the Co-Payment Circumvention Enterprise (as described more fully above) through a pattern of racketeering activity.

614.    The Assignors and the Class Members are "persons" as defined in Fla. Stat § 1.01, injured in their business or property, because of Defendants' racketeering violations.

### *Description of the Co-Payment Circumvention Enterprise*

615.    Defendants are "persons" under Fla. Stat. § 1.01.

616.    Regeneron, CDF, PANF, the Lash Group, Besse, and ABC are members of and constitute an "association in-fact enterprise."

617.    The Co-Payment Circumvention Enterprise is an association-in-fact of individuals and corporate entities under Fla. Stat. § 772.101 and consists of "persons" associated for a common purpose.

618.    The purpose of the Co-Payment Circumvention Enterprise was to maximize Regeneron's profits and CDF's and PANF's executive compensation.

619.     The Co-Payment Circumvention Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. Regeneron is the source of the alleged Scheme, including providing kickbacks to subsidize payments for Eylea whose co-payments were provided by CDF and PANF.

620.     CDF and PANF accepted Regeneron's bribes and provided unlawful payments for Eylea. CDF, PANF and the Lash Group facilitated and illegally provided grant assistance data to Regeneron.

621.     Regeneron, CDF, PANF, and the Lash Group, individually and collectively, fulfilled their roles in the Co-Payment Circumvention Enterprise.

622.     Regeneron, CDF, PANF, and the Lash Group were distinct legal entities with distinct purposes. For Regeneron, the sole purpose was to make as much money off of Eylea as possible. For CDF and PANF, it was to raise the amount of money in the funds to justify paying higher salaries to their executives.

623.     The Co-Payment Circumvention Enterprise had an existence that was distinct from the pattern of racketeering in which Regeneron, CDF, PANF and the Lash Group engaged. Each Defendant conspired with each other to minimize and conceal the amount of information Assignors and the Class Members received about the claims for payment of Eylea, materially resulting in Assignors' and the Class Members' payment of the inflated purchase price of Eylea that they would not have otherwise paid for. See Fla. Stat. § 817.234 ("A person commits insurance fraud punishable . . . if that person, with the intent to injure, defraud, or deceive any insurer . . . [p]resents or causes to be presented any written or oral statement, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or

misleading information concerning any fact or thing material to such claims[.]").

624.    At all relevant times, Regeneron, CDF, PANF, and the Lash Group operated, controlled, and managed the Co-Payment Circumvention Enterprise. Regeneron, CDF, and PANF failed to disclose a material fact about the existence of the bribes in violation of Fla. Stat. § 817.234, which prohibits causing innocent, non-party pharmacies and physicians to submit false submissions of payments to Assignors and the Class Members.

625.    Regeneron, CDF, PANF, the Lash Group's participation in the Co-Payment Circumvention Enterprise was necessary for the successful operation of the Scheme. The members of the Co- Payment Circumvention Enterprise all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was an illegal kickback, funded by bribes from Regeneron, while minimizing the amount of information that Assignors, the Class Members, and the innocent non-party pharmacies and physicians, knew about the program. These affirmative acts and strategic omissions were material to Assignors' and the Class Members' decision to issue payment for Eylea. The Co-Payment Circumvention Enterprise's actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for Eylea.

626.    Fla. Stat. § 772.102 provides that criminal activity is any activity chargeable by indictment or information under Florida law, including Fla. Stat. § 817.234. Section 817.234 criminalizes situations where health care companies, such as Assignors and the Class Members, are provided incomplete or misleading information about any fact or thing material to a claim for payment. As discussed below, Regeneron, CDF, and PANF have violated Fla. Stat. § 817.234 by providing incomplete or misleading information material to Assignors' and the Class Members' decision to issue payment for Eylea.

627.    Regeneron, CDF, PANF, and the Lash Group committed numerous acts of racketeering by providing incomplete or misleading information related to Eylea. Regeneron, CDF, PANF, and the Lash Group knew or had reason to know that they were providing incomplete or misleading information about these claims.

628.    Regeneron, CDF, PANF, and the Lash Group knew or had reason to know that they were providing incomplete or misleading information under Fla. Stat. § 817.234. Despite knowledge of these facts, they induced Assignors and the Class Members to make payment for claims that they otherwise would not have paid. Instead, Regeneron, CDF, PANF, and the Lash Group knowingly provide incomplete information to enrich their bottom line.

629.    Based on these omissions, Assignors and the Class Members provided payments for the Eylea throughout the United States, including Florida, based on half-truths, inaccurate information, and deliberate omissions. Defendants' omissions were material to the payment of Eylea that the Assignors and Class Members paid for. Had the Assignors and Class Members known of the Co-Payment Circumvention Enterprise, they would not have issued payments for Eylea.

630.    The Assignors and Class Members were the primary, intended, and most direct victims of Defendants' unlawful Scheme. The Assignors and Class Members paid for Eylea throughout the United States, including Florida, based on Defendants' omissions of material information under Fla. Stat. § 817.234.

631.    As part of this Scheme, Defendants caused innocent, non-party pharmacies to submit false certifications and misled Assignors and the Class Members into paying for prescriptions of Eylea. Defendants conducted or participated, directly or indirectly, in the Co-Payment Circumvention Enterprise through a pattern of unlawful activity.

632.     By reason of and as a result of Defendants' illegal conduct, the Assignors and Class Members were injured in their business or property.

633.     Defendants' violations directly and proximately caused injuries and damages to the Assignors and Class Members; and Plaintiffs have a right to bring this action for the alleged damages.

634.     Under Fla. Stat. § 772.11, Plaintiffs seek their reasonable attorneys' fees and costs associated with prosecution of this action.

## SIXTH CLAIM FOR RELIEF

### Tortious Interference with Contract
*Against All Defendants*

635.     Plaintiff re-allege and incorporate by reference paragraphs 1–411 of this Complaint as if fully set forth herein.

636.     Assignors' Medicare coverage plans is materially similar to the terms of CMS' model evidence of coverage.[27]

637.     Assignors' MA plans require that covered patients personally bear the cost-sharing responsibility provided by the plans when obtaining prescription drugs, such as Eylea.

638.     Regeneron knew that Assignors' MA plans contained these cost-sharing provisions, which are standard features for nearly all MA plans. Regeneron deliberately sought to subvert these provisions through its illegal copay scheme. By rendering Eylea cost-free for patients, Regeneron improperly increased the demand for Eylea and maintained Eylea's exorbitant price, improperly increasing the costs Assignors and other healthcare plans were required to pay for Eylea.

639.     In doing so, Regeneron intentionally and tortiously interfered with the cost-sharing

---

[27] Available at https://www.cms.gov/files/document/nyiageocchapter9cy2020.docx

provisions in the Assignors' contracts. Regeneron's interference caused Assignors' beneficiaries to breach their agreements with Assignors by failing to pay the cost-sharing obligations set forth in their healthcare plans.

640.   Regeneron's interference and procurement of those contractual breaches was wrongful and without justification and intended to defeat the structure of Assignors' managed care system and to benefit Regeneron financially at the Assignors' expense.

641.   The contractual breaches caused by Regeneron have directly and proximately cause significant damages to Assignors in the form of payments made by Assignors that it would not have made is Assignors had known that identifiable claims were tainted by Regeneron's illegal scheme.

642.   By virtue of the foregoing, the Assignors are entitled to compensatory and punitive damages, in amounts to be determined at trial, and other relief.

## DEMAND FOR JUDGEMENT

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants as follows:

1.   Awarding Plaintiffs and the Class Members actual, consequential, compensatory, statutory, treble, punitive, and other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2.   Awarding Plaintiffs and the Class Members equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

3.   Declaring the alleged acts to be unlawful under the state statutes set forth above, and the common law of unjust enrichment of the states and territories set forth above;

4.    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel.

5.    Awarding Plaintiffs and the Class Members their reasonable costs and expenses, including attorneys' fees; and

6.    Awarding such other legal or equitable relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs and the Class Members demand a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38.

Dated: June 24, 2024                        Respectfully submitted,

By: */s/ Shereef H. Akeel*
Shereef H. Akeel (D.D.C. Bar No. MI0042)
Adam S. Akeel (MI Bar No. P81328)
Sam R. Simkins (MI Bar No. P81210)
Daniel W. Cermak (MI Bar No. P84460)
Hayden E. Pendergrass (MI Bar No. P86888)
Emad R. Hamadeh (MI Bar No. P86849)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road, Ste. 350
Troy, Michigan 48084
shereef@akeelvalentine.com
adam@akeelvalentine.com (pro hac vice)
sam@akeelvalentine.com (pro hac vice)
daniel@akeelvalentine.com (pro hac vice)
hayden@akeelvalentine.com (pro hac vice)
emad@akeelvalentine.com (pro hac vice)

John W. Cleary (Fla. Bar No. 118137)
Aida M. Landa (Fla. Bar No. 136451)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Road, 10th Floor
Coral Gables, Florida 33134
(305) 614-2222
jcleary@msprecoverylawfirm.com (pro hac vice)

138

alanda@msprecoverylawfirm.com (pro hac vice)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 24, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

/s/Adam S. Akeel
Adam S. Akeel

# Index of Exhibits

**A)** Assigned Claims

**B)** Assignment Agreements

**1)** CDF's 2006 Advisory Opinion

**2)** CDF's Form 990 Tax Filings

**3)** PANF's 2007 Advisory Opinion

**4)** PANF's 2011 Advisory Opinion

**5)** PANF's  Form 990 Tax Filings

**6)** Department of Health and Human Services, Medicare Payments for Drugs Used to Treat Wet Age-Related Macular Degeneration

**7)** Exposure Analysis for VEGF Trap-Eye

**8)** Robert Davis Deposition Excerpts

**9)** DOJ Expert Report, Dr. Leemore Dafny

**10)** Sherman Email – July 28, 2011

**11)** Leonard Schleifer Deposition Excerpts

**12)** Beth Holly Deposition Excerpts

**13)** Trade and Distribution Presentation

**14)** Product Acquisition, EYLEA 4U and Marketing Resources

**15)** Sherman Email – August 9, 2011

**16)** Donation Agreement

**17)** Regeneron's Summary of Charitable Contributions by Year

**18)** Krukowski Email – March 2, 2012

**19)** Casey Email – March 7, 2012

**20)** Klein-Lewis Email – March 14, 2012

**21)** Settlemyer Email – April 12, 2012

**22)** Deane Email – June 14, 2012

**23)** Sympreaux Email – September 4, 2012

**24)** Orkin Email – December 13, 2012

**25)** Mukand Email – January 9, 2014

**26)** Allison Email – February 3, 2014

**27)** Declaration of Wendi Stapleton

**28)** Declaration of Nicole Siegel, M.D.

**29)** Declaration of Manju Sabramanian, M.D.

**30)** Regeneron's Draft Declaration for Dr. Ramin Sarrafizadeh

**31)** Declaration of Dr. Ramin Sarrafizadeh

**32)** Declaration of Dr. Daniel Miller

**33)** Ellen Adams Deposition Excerpts

**34)** Krukowski Email – April 6, 2012

**35)** Stowe Email – July 10, 2012

**36)** Perry Email – July 19, 2012

**37)** Daniels Email – July 23, 2012

**38)** Daniels Email – May 13, 2013

**39)** Robert Krukowski Deposition Excerpts

**40)** Krukowski Email – July 9, 2012

**41)** Daniels Email – July 24, 2012

**42)** Daniels Email – July 24, 2012

**43)** William Daniels Deposition Excerpts

**44)** Declaration of Charles Moorman

**45)** Dennis Regan Expert Rebuttal Report

**46)** CDF's January 25, 2013 Projections to Genentech

**47)** CDF's January 25, 2013 Projections to Regeneron

**48)** Casey Email – August 15, 2012

**49)** Daniels Email – August 16, 2012

**50)** Walley Email – August 16, 2012

**51)** Krukowski Email – August 16, 2012

**52)** The Lash Group Report

**53)** August 20, 2012 Meeting Invite

**54)** Daniels Email – August 27, 2012

**55)** Daniels Email – October 4, 2012

**56)** Terifay Email – December 3, 2012

**57)** Daniels Email – December 5, 2012

**58)** Casey Email – December 19, 2012

**59)** Walley Email – December 19, 2012

**60)** Daniels Email – December 20, 2012

**61)** January 3, 2012 Meeting Invite

**62)** Krukowski Email – January 3, 2013

**63)** Fenimore Email – January 4, 2013

**64)** Daniels Email – January 4, 2013

**65)** Mahoney Email – January 25, 2013

**66)** Daniels Email – January 31, 2013

**67)** Daniels Email – February 6, 2013

**68)** Clorinda Walley Deposition Excerpts

**69)** Agent Sawyer Deposition Excerpts

**70)** Physician ATU: Wave 2 Presentation

**71)** Terifay Email – February 22, 2013

**72)** Terifay Email – February 25, 2013

**73)** Daniels Email – April 5, 2013

**74)** Daniels Email – June 24, 2013

**75)** Fenimore Email – June 26, 2013

**76)** Daniels Email – June 27, 2013

**77)** Fenimore Email – July 9, 2013

**78)** Walley Email – July 10, 2013

**79)** Daniels Email – September 24, 2013

**80)** Dressel Email – September 24, 2013

**81)** Daniels Email – September 23, 2013

**82)** Daniels Email – September 24, 2013

**83)** Dressel Email – September 30, 2013

**84)** Walley Email – September 25, 2013

**85)** Capobianco Email – November 4, 2013

**86)** Krukowski Email – November 25, 2013

**87)** Daniels Email – November 25, 2013

**88)** Daniels Email – November 25, 2013

**89)** Davis Email – December 4, 2013

**90)** Krukowski Email – December 5, 2013

**91)** Davis Email – December 6, 2013

**92)** Daniels Email – December 6, 2013

**93)** Ian Dew Expert Report

**94)** Murray Goldberg Deposition Excerpts

**95)** Walley Email – January 3, 2013

**96)** Daniels Email – January 3, 2014

**97)** Daniels Email – January 4, 2014

**98)** Davis Email – January 4, 2014

**99)** Daniels Email – January 6, 2014

**100)** Davis Email – January 10, 2014

**101)** OIG Notice to PANF

**102)** CDF Modified Advisory Opinion

**103)** PANF Modified Advisory Opinion

**104)** Mahoney Email – November 2, 2016

**105)** Pygon Email – January 5, 2017

**106)** March 2019 Presentation to the DOJ

**107)** September 2019 Presentation to the DOJ

**108)** DOJ Press Release

**109)** CDF Settlement Agreement

**110)** PANF Settlement Agreement